168 F.Supp.2d 1055 (2001)
Robert A. SHAFER, Petitioner,
v.
Michael BOWERSOX, Respondent.
No. 4:98-CV-1881.
United States District Court, E.D. Missouri, Eastern Division.
October 3, 2001.
*1056 *1057 *1058 Charles M. Rogers, Cheryl A. Pilate, Wyrsch, Hobbs, Mirakian & Lee, P.C., Kansas City, MO, for plaintiffs.
Robert A. Shafer, PCC, Mineral Point, MO, pro se.
Frank A. Jung, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, for defendants.

MEMORANDUM OPINION AND ORDER
PIERSOL, District Judge.
Robert A. Shafer filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.  2254, seeking relief from a Missouri state trial court's[1] imposition of the death penalty for the April 29, 1990 murders of Keith Dennis Young and Ford Jerry Parker. Following a direct appeal and post-conviction proceedings, the Missouri Supreme Court affirmed the imposition of the death penalty. For the reasons explained below, the Court rejects Shafer's claims that his confessions violate his Sixth Amendment right to counsel; he received ineffective assistance of counsel; his death sentence is disproportionate; the aggravating circumstances found by the trial court were invalid; and he was denied a fair trial due to ex parte communications between the trial court and the prosecutor. The petition, however, is granted on Shafer's claims that his waiver of counsel for the guilty plea and sentencing phases, his guilty plea, and his waiver of the right to present mitigating evidence were not made knowingly, intelligently and voluntarily and on Shafer's claim that the trial court failed to consider mitigating circumstances in sentencing him to the death penalty.[2]

I. Facts and Procedural History
Robert Shafer pled guilty to two counts of murder in the first degree and two counts of armed criminal action and was sentenced to death on the murder counts and life imprisonment on the armed criminal actions counts, without the assistance of counsel. Shafer was 22 years old at the time he pled guilty and was sentenced. The factual basis for the uncounselled guilty plea entered by Shafer consisted of a written confession and a videotaped confession given to law enforcement officers in July 1992. Shafer's co-defendant, David Steinmeyer, was sentenced on October 21, 1992, to 12 years and 6 months' imprisonment pursuant to a plea agreement with the State. (App. at 2151-52.)
The confessions given to law enforcement officers in July 1992 conflict with several other versions of the crimes Shafer gave to mental health professionals and with the co-defendant's version.[3] Shafer, however, confirmed during the change of plea hearing that the July 1992 confessions were the true and correct versions of the crimes.
Shafer's confessions reveal that on April 29, 1990, he and his friend David Steinmeyer *1059 talked about robbing some homosexuals and beating them up. After consuming drugs and alcohol, Shafer retrieved a .22 revolver and five shells from his sister's home where he was living. Around 8:45 p.m. Shafer and Steinmeyer went to a popular hang-out and approached two men, Young and Parker, as they were kissing and hugging. Young and Parker agreed to give Shafer and Steinmeyer a ride to a nearby town. During the ride, Shafer and Steinmeyer agreed they would rob Young and Parker. Shafer took control of the vehicle by force and Steinmeyer held Young and Parker at gun point until they arrived in a secluded area. Steinmeyer struggled with Parker and Shafer struggled with Young until both Parker and Young were in a ditch. As Parker was attempting to flee, Shafer fired two shots from the .22 revolver he had taken from his sister's house. At least one shot hit Parker in the face. Shafer then returned to Young's location in the ditch. Young pleaded for his life and started to flee. Shafer fired one shot at Young, hitting him in the back. Shafer loaded the remaining two shells in the .22 revolver and fired two more shots at Young, at least one of which was at Young's head.
Shafer and Steinmeyer retrieved the car and drove near Young's body. Young was unconscious and bleeding when Shafer took a lighter out of Young's pocket. Shafer then drove to Parker's body. Parker was not breathing. Shafer took approximately $100 and cigarettes out of Parker's pockets. Shafer drove the car away from the scene and discussed with Steinmeyer where to leave the car. They arrived in St. Charles around 10:30 p.m. They removed items from the car that might have their fingerprints on them and left the car at a gas station. They took the car stereo, speakers, cassette tapes and the .22 revolver to Shafer's sister's house. Shafer returned the .22 revolver to his sister's room and placed the five shell casings in his bedroom closet.
The next day, the police discovered Young and Parker's bodies and found their car. Shafer and Steinmeyer talked about the shooting and Steinmeyer said he talked to somebody at school about the shooting. Shafer called his mother and told her he might have shot two people and then he and Steinmeyer went to confession. After confession, they told several people they were leaving town. Shafer told his brother, Michael, he had shot two people the night before. When they stopped for gas on their way to Texas, Shafer and Steinmeyer agreed to turn themselves into the police in St. Charles. While driving back to St. Charles to turn themselves in, they talked about what to tell the police. Steinmeyer agreed to let Shafer write a statement saying that Shafer shot Young and Steinmeyer shot Parker. Shafer and Steinmeyer turned themselves into the police and were arrested. The police retrieved the .22 revolver from Shafer's sister's house, but later returned it to Shafer's brother-in-law.
Shafer was charged with two counts of first degree murder and two counts of armed criminal action. From April 30, 1990 to the date of his change of plea hearing on January 4, 1993, Shafer was detained at the St. Charles County Jail. During this two-and-one-half years, Shafer was represented by seven different attorneys. Shafer wrote numerous letters to several individuals and organizations during his incarceration at the St. Charles County Jail. (See App. at 2549-747.) The letters express Shafer's conflicting thoughts about whether he was guilty of murder; whether he wanted to be represented by an attorney or waive such representation; suppressing his confessions; having a mental evaluation; and whether to go to trial or plead guilty. (Id.) Shafer *1060 wrote several letters complaining that his attorneys were not working on his case or doing anything to help him. (Id.) On August 8, 1991, fifteen months after his arrest, Shafer first suggested he may want to waive his right to counsel because he felt his attorney, Mr. Paul Madison, was rendering ineffective assistance of counsel. (App. at 2596-97.) Mr. Madison was eventually removed as Shafer's court-appointed counsel and several other attorneys were thereafter appointed as various times. Shafer's competency was questioned and the trial court ordered a mental health examination. Shafer eventually filed a motion to proceed pro se and the trial court conducted a hearing on this motion on July 27, 1992. The trial court took the motion under advisement and later ordered a second mental health examination.
Throughout his confinement at the St. Charles County Jail, Shafer repeatedly complained orally and wrote several letters complaining about the conditions of his confinement. (See App. at 2549-747.) Less than one month before Shafer's change of plea hearing, a state circuit court[4] conducted a hearing on Shafer's motion to transfer to a new jail. Ruling from the bench on December 12, 1992, the state court denied Shafer's motion to transfer. (JT at 197-202.)
On January 4, 1993, the trial court conducted a second hearing on Shafer's motion to proceed pro se. During this hearing, the trial court granted Shafer's motion to waive his right to counsel, but ordered his court-appointed counsel to remain in the courtroom as a resource for Shafer. (GPT at 13.) In the same proceeding, the trial court accepted Shafer's uncounselled guilty plea and sentenced Shafer to death on each of the murder counts and to life imprisonment on the armed criminal action counts. (GPT at 13, 48-49.)
Shafer filed a direct appeal of his conviction and sentence with the Missouri Supreme Court. Shafer also filed a Missouri Rule 24.035 postconviction motion. Following a three-day evidentiary hearing, the post-conviction court held that Shafer's guilty plea and resulting conviction were valid, but that Shafer must be re-sentenced. (App. at 3896, 3899, 3910.) Both Shafer and the State appealed the post-conviction court's decision. Shafer's direct appeal and the appeal of the post-conviction court's decision were consolidated. See State v. Shafer, 969 S.W.2d 719(Mo.), cert. denied, 525 U.S. 969, 119 S.Ct. 419, 142 L.Ed.2d 340 (1998). On May 26, 1998, the Missouri Supreme Court affirmed Shafer's conviction, reversed the post-conviction court's order to re-sentence Shafer, and affirmed the death sentence on the murder charges. Id. at 742. Following the United States Supreme Court's denial of his Petition for Writ of Certiorari, Shafer v. Missouri, 525 U.S. 969, 119 S.Ct. 419, 142 L.Ed.2d 340 (1998), Shafer filed the present petition for writ of habeas corpus pursuant to 28 U.S.C.  2254.

II. Decision
The Supreme Court explained the standard for granting habeas relief to a state prisoner under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):
[Section] 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under  2254(d)(1), the writ may issue only if one of the following two conditions is satisfied ÔÇö the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved *1061 an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.
Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411, 120 S.Ct. 1495. "The state court's application must also be unreasonable." Simmons v. Bowersox, 235 F.3d 1124, 1130 (8th Cir.2001) (citing Williams, 529 U.S. at 411, 120 S.Ct. 1495). "Whether a state court's application was unreasonable is an objective inquiry." Simmons, 235 F.3d at 1130 (citing Williams, 529 U.S. at 411, 120 S.Ct. 1495). In addition to relief under 28 U.S.C.  2254(d)(1), a state prisoner's application for writ of habeas corpus may be granted if the state court's adjudication of the prisoner's claim on the merits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.  2254(d)(2).

A. Constitutionality of Shafer's Confessions
Shafer contends his waiver of counsel and plea of guilty were not knowing, intelligent and voluntary because they were the product of an unconstitutional police interview. Shafer asserts his rights to due process, representation of counsel, and effective assistance of counsel, and his right to be free from cruel and unusual punishment, guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, were violated by the improper interview and actions of the prosecutor.
Officer Simcox met briefly with Shafer on July 23, 1992, after Shafer contacted Simcox, and Shafer stated he wanted to "take full responsibility for the shootings." (HT at 675.) Simcox then contacted Shafer's counsel, Susan McGraugh, and the prosecutor, Timothy Braun. Braun informed Simcox that Simcox could not initiate contact with Shafer in the absence of counsel, but Braun did not advise Simcox on whether he should interview Shafer if Shafer initiated contact with Simcox. Braun did, however, inform Simcox that he would seek the death penalty if Shafer confessed to the murders. Shafer's counsel explicitly directed Simcox and Braun to not speak with Shafer about the case in her absence.
Simcox received a letter from Shafer on July 24, 1992, indicating Shafer wanted to talk to Simcox and stating "I am willing to give whatever is necessary." (App. at 3127.) Despite Shafer's counsel's oral and written directions, Simcox conducted the post-arraignment interview of Shafer in the absence of his counsel on July 24, 1992. Shafer signed a written waiver of his Miranda[5] rights in the videotaped interview prior to Simcox asking any questions regarding *1062 the murders. Shafer also acknowledged during the videotaped interview that his counsel had advised him not to speak to the police but that Shafer desired to disregard counsel's advice and proceed with the interview in the absence of counsel. Prior to Simcox's interview, Shafer studied the statutory aggravating circumstances justifying imposition of the death penalty. Shafer gave written and videotaped confessions during the interview with Simcox on July 24, 1992. Relying on Shafer's confessions, Braun filed a notice to seek the death penalty and a notice of aggravating circumstances on July 31, 1992. Shafer's July 24, 1992 confessions formed the factual basis for both Shafer's guilty plea and the finding of aggravating circumstances by the sentencing court.
A hearing regarding Shafer's mental competency and on Shafer's motion to proceed pro se were scheduled for July 27, 1992. The prosecutor's office knew Shafer was undergoing evaluations by mental health experts and knew the hearing was scheduled at the time Simcox informed Braun of Shafer's comments on July 23, 1992. Shafer contends the prosecutor and the police exploited his mental and emotional state, specifically his desire to "punish" counsel by seeking the death penalty due to problems he was having with her. In support of this claim, Shafer cites Dr. Daniel J. Cuneo's opinion that:
Mr. Shafer's personality characteristics are such that his accountings of the event bounce to whatever he feels at the time. His version is dependent upon his mood and his mood vacillates to his childish and immature whims. Presently he can't get exactly what he wants and he wants to kill himself. It is as if he were saying, "If you don't give me what I want right now and give me all of the attention I want right now, I'm going to kill myself. This will teach you!"
(App. at 2543, 2547.)
Although noting the prosecutor's actions surrounding the taking of Shafer's confessions had a "questionable appearance," the post-conviction court held that the taking of Shafer's confessions was not unlawful as a violation of his right to counsel because Shafer voluntarily chose to make the statements to Simcox against the advice of counsel. (App. at 3902, 3906.) The Missouri Supreme Court did not directly address the constitutionality of Shafer's July 24, 1992 confessions. However, the court denied all of Shafer's claims regarding waiver of counsel and entry of a guilty plea. Shafer, 969 S.W.2d at 731, 734. The Missouri Supreme Court expressly relied upon Shafer's written confession as the factual basis for both Shafer's guilty plea and the finding of aggravating circumstances. Id. at 723, 734.
Shafer contends the Sixth Amendment right to counsel prohibits the police from questioning an accused in the absence of counsel after the initiation of formal adversary proceedings. This argument does not, however, address the effect of a defendant's waiver of his Sixth Amendment right to counsel or the distinction between police-initiated questioning and questioning initiated by the accused. Quoting the Supreme Court's opinion in Maine v. Moulton, Shafer asserts that "the prosecutor and the police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." 474 U.S. 159, 171, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The State contends, however, that Shafer waived his Sixth Amendment right to counsel and that this issue is governed by the Supreme Court's decision in Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988).
*1063 The right to the assistance of counsel guaranteed by the Sixth Amendment includes the right to have counsel present at post-arraignment interrogations. See Michigan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). In Edwards v. Arizona, the Supreme Court held in the context of the Fifth Amendment, an accused person in custody who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (emphasis added). The rule in Edwards, was later held to apply in the Sixth Amendment context, to a defendant formally charged with a crime who requested the assistance of counsel at the arraignment. See Jackson, 475 U.S. at 626, 106 S.Ct. 1404. The Supreme Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." Id. at 636, 106 S.Ct. 1404 (emphasis added).
The bright-line rule of invalidity of a waiver of the right to counsel in Jackson, 475 U.S. at 636, 106 S.Ct. 1404, does not apply in the case at bar because Shafer, rather than the police, initiated the post-arraignment interview with Simcox. In the context of the Fifth Amendment, if an accused initiates contact with the police, the accused may waive the Fifth Amendment right to counsel for such post-arraignment interrogations. See Wyrick v. Fields, 459 U.S. 42, 47-48, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982); Oregon v. Bradshaw, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (holding that where an accused asserts his Fifth Amendment right to counsel but then initiates a conversation with police while in custody, the Edwards rule is not violated, and the question becomes whether the accused validly waived his right to counsel). The Eighth Circuit recognized that essentially the same standard for evaluating the validity of a waiver of counsel under the Fifth Amendment after the defendant invoked his right to counsel applies in assessing the validity of a Sixth Amendment waiver of counsel where the defendant initiated post-arraignment contact with police. See Fields v. Wyrick, 706 F.2d 879, 881 (8th Cir.), cert. denied, 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983); United States v. Eagle Elk, 711 F.2d 80, 82 (8th Cir. 1983), cert. denied, 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984) (stating that "the appropriate standard for reviewing the validity of a waiver of the sixth amendment right to have counsel present at an interrogation is essentially the same standard applied to waivers of the fifth amendment right to counsel where the right to counsel has been previously invoked." (footnote omitted)). Thus, the pertinent question is whether Shafer validly waived his Sixth Amendment right to counsel.
In the context of a Sixth Amendment waiver of right to counsel, the Supreme Court explained in Johnson v. Zerbst, that courts should "indulge every reasonable presumption against waiver of fundamental constitutional rights." 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In light of this presumption, the Supreme Court held "it is the State that has the burden of establishing a valid waiver." Jackson, 475 U.S. at 633, 106 S.Ct. 1404 (citing Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)).
In Johnson, the Supreme Court held that a waiver of the Sixth Amendment right to counsel is valid only if the waiver is "an intentional relinquishment or abandonment of a known right or privilege." *1064 304 U.S. at 464, 58 S.Ct. 1019; see Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (same). In the Fifth Amendment context, the Supreme Court held that, "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case `upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.'" Edwards, 451 U.S. at 482, 101 S.Ct. 1880 (quoting Johnson, 304 U.S. at 464, 58 S.Ct. 1019). The Supreme Court summarized the key inquiry in determining whether a waiver is valid: "Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel?" Patterson, 487 U.S. at 292-93, 108 S.Ct. 2389. To be valid, the waiver of an accused's Sixth Amendment right to counsel must also be voluntary. See id. 292 n. 4, 108 S.Ct. 2389.
Shafer admits he initiated contacts with Officer Simcox on July 23 and 24, 1992. In his handwritten letter to Simcox, dated July 24, 1992, Shafer acknowledged his attorney advised him not to speak with the police but stated he wanted to talk to Simcox despite that advice. (App. at 3127.) In the July 24, 1992 letter, Shafer also explicitly waived his right to have counsel present during any further questioning by the police. (App. at 3127.) In the videotaped confession, Shafer expressed his desire to speak with the police in the absence of his counsel despite his counsel's advice. Prior to the interview with Simcox, Shafer signed a waiver of rights form which specifically informed him that anything he said could be used against him in a court of law and that he had the right to have an attorney present during any questioning. Shafer orally affirmed his waiver of rights during the videotaped interview with Simcox on July 24, 1992. Simcox asked Shafer during the videotaped interview if Shafer wanted to waive his right to have counsel present even though Shafer's counsel advised him not to speak with the police. Shafer explicitly stated he wanted to talk to Simcox against his counsel's advice. Shafer's initiation of contact with the police and his written and oral representations on July 24, 1992, that he understood he had a right to have counsel present during the interview with Simcox and that any statements he made could be used against him in a court of law, demonstrate that Shafer made a knowing and intelligent waiver of his right to counsel.
Shafer contends the police and the prosecutor exploited his mental and emotional state to obtain the written and videotaped confessions. It is not clear from Shafer's argument whether he contends the alleged exploitation affects the voluntariness inquiry or the knowing and intelligent inquiry in evaluating the validity of a waiver of the right to counsel. The knowing and intelligent inquiry was addressed above. As to the voluntariness inquiry, the record does not contain evidence of coercion on the part of the prosecutor or the police. To the contrary, all of the evidence in the record demonstrates that Simcox did not exert any pressure on Shafer to convince him to make a statement in the absence of his counsel. Upon the first contact initiated by Shafer on July 23, 1992, Simcox did not immediately conduct an interview. Rather, he notified defense counsel and the prosecutor of the communication with Shafer. It was only after receiving a second communication from Shafer requesting an interview that Simcox spoke with Shafer about the crimes with which Shafer was charged. During the interview, Shafer never expressed any reservation or hesitation *1065 about speaking with Simcox in the absence of his counsel.
Shafer reaffirmed his desire to waive counsel during the hearing on his motion to proceed pro se which was held on July 27, 1992, three days after the interview with Simcox. During the hearing, Shafer testified "I tried to give a confession for almost the whole time I was here. I wanted to confess to the crime and the attorney stopped me and I finally did it Friday and I did it without ÔÇö or, against Mrs. McGraugh's wishes. I don't want to cooperate with counsel. I don't want an attorney. I think that I'm best represented by myself because I know better than anybody what happened and that I've been on the case a lot longer than anybody." (PST at 6-7.) The prosecutor specifically inquired about the voluntariness of Shafer's waiver of his right to counsel during the July 27, 1992, hearing:
Q. Are you doing this voluntarily? Has anyone forced you or in any way tried to coerce or suggest to you that you should fire your attorney and proceed pro se?
A. No. From the beginning I really didn't even want an attorney because I didn't want to blame nobody else for anything that happened to me. Some suggestions were made, but, no, not by any attorneys that I've been represented by and I've did this solely on my own.
Q. No one's forcing you in any way?
A. No one's forcing me.
Q. This is a completely voluntarily [sic] act on your part?
A. Yes, it is."
(PST at 9.) Although Dr. Cuneo's opinion regarding Shafer's personality characteristics may cast doubt upon the voluntariness of Shafer's waiver of counsel, that doubt does not show that Shafer's waiver of counsel for the police interview was involuntary considering the totality of the circumstances surrounding the interview as explained above.
In contrast to the police conduct in Brewer, where the Supreme Court held the accused's waiver of his Sixth Amendment right to counsel was invalid, neither the prosecutor nor the police made any promise to defense counsel that they would not speak with Shafer in her absence. 430 U.S. at 405, 97 S.Ct. 1232. Prior to questioning the defendant, the police officer in Brewer did not inquire whether the defendant desired to waive his right to counsel and the defendant never expressed a willingness to be questioned in the absence of an attorney. Id. at 392, 405, 97 S.Ct. 1232. In contrast, Simcox expressly asked Shafer if he wanted to waive his right to counsel for the interview. The case at bar is also distinguishable from several cases cited by Shafer in support of his Sixth Amendment claim. See Moulton, 474 U.S. at 171, 106 S.Ct. 477 (holding the defendant's Sixth Amendment right to counsel was violated where post-arraignment incriminating statements were obtained by a co-defendant working undercover for the police); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (same); United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (holding that "the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government."). In the cases cited by Shafer, the defendants were unaware the police were questioning them and were not advised of their rights to have counsel present; therefore, the defendants could not have waived their rights to counsel for post-arraignment, police-initiated interrogation.
In light of the totality of the circumstances surrounding Shafer's written and *1066 videotaped confessions, including Shafer's explicit oral and written waivers of his right to counsel and Simcox's explanations of his rights, the State has carried its burden to show that Shafer was made "sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel[.]" Patterson, 487 U.S. at 292-93, 108 S.Ct. 2389. The Court does not, however, condone the actions of the prosecutor in tacitly approving of, or the police in conducting, an interview of Shafer, in the absence of counsel, where Shafer's mental competency was questionable and the interview was conducted against the express directions of Shafer's counsel. Based upon the above analysis, the Missouri Supreme Court's implicit holding that Shafer's Sixth and Fourteenth Amendment rights were not violated was neither contrary to nor did it involve an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. See 28 U.S.C.  2254(d)(1). Additionally, the Missouri Supreme Court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C.  2254(d)(2).

B. Waiver of Counsel at the Change of Plea Hearing
Pursuant to the Sixth Amendment, an accused has a right to represent himself, but waiver of the right to counsel must be made knowingly, intelligently and voluntarily. Faretta v. California, 422 U.S. 806, 819-21, 835-36, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The Supreme Court explained that "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.'" Id. at 835, 95 S.Ct. 2525 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). Whether a waiver of counsel is valid depends "in each case upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." Edwards, 451 U.S. at 482, 101 S.Ct. 1880; see Wilkins v. Bowersox, 145 F.3d 1006, 1012 (8th Cir. 1998), cert. denied, 525 U.S. 1094, 119 S.Ct. 852, 142 L.Ed.2d 705 (1999) (stating that "[i]n the waiver of counsel context, ... a defendant's background and personal characteristics are highly relevant in determining the validity of such a waiver."). In light of the importance of the assistance of counsel in our adversarial system of justice, courts are to "indulge every reasonable presumption against waiver [of the right to counsel]." Johnson, 304 U.S. at 464, 58 S.Ct. 1019.
The Supreme Court held in Godinez v. Moran, "[a] finding that a defendant is competent to stand trial ... is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings." Id. at 401 n. 12, 113 S.Ct. 2680 (emphasis in original). "The purpose of the `knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." Id. *1067 (emphasis in original). "A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (plurality). Citing the Supreme Court's decision in Godinez, the Eighth Circuit explained that "[t]o validly waive counsel, a defendant must actually understand all of the relevant considerations; thorough advice form the court alone is not sufficient." Wilkins, 145 F.3d at 1011. The Eighth Circuit further recognized that a trial court should not merely take the defendant's statement that he is knowingly and intelligently waiving counsel "at face value." Wise v. Bowersox, 136 F.3d 1197, 1203 (8th Cir.), cert. denied, 525 U.S. 1026, 119 S.Ct. 560, 142 L.Ed.2d 466 (1998).
Shafer contends his waiver of counsel during the change of plea hearing was invalid because it was not a knowing, intelligent and voluntary waiver. In advancing this claim, Shafer heavily relies on the Eighth Circuit's decision in Wilkins, invalidating a similar waiver of counsel. 145 F.3d at 1016-17. Citing the Supreme Court's decision in Von Moltke, 332 U.S. at 721, 68 S.Ct. 316, Shafer asserts the trial court failed to conduct the type of thorough and penetrating examination of Shafer, regarding his stated desire to waive representation by counsel, to ensure that Shafer understood the rights being waived and that he was relinquishing them knowingly and voluntarily. The trial court is required, according to Shafer, to probe into the defendant's background, physical and mental health, his knowledge of the nature of the charges and possible defenses, and whether any mistreatment or coercion influenced his decision to waive the right to counsel. The coercive effect of the conditions in the St. Charles County Jail, argues Shafer, strongly influenced his impulsive decision to waive counsel, plead guilty and seek the death penalty. In evaluating Shafer's request to proceed pro se, Shafer asserts the trial court conducted only the most superficial inquiry, utilizing leading questions not designed to penetrate the surface, to determine if Shafer's waiver of counsel was knowing, intelligent and voluntary. Shafer further contends the trial court and the Missouri Supreme Court committed legal error by resting their decisions, that Shafer validly waived his right to counsel, almost entirely on a finding that Shafer was competent to stand trial.
The State contends this case is distinguishable from Wilkins, 145 F.3d at 1009-10. Moreover, stating that the Supreme Court's decision in Von Moltke, 332 U.S. at 708, 68 S.Ct. 316 is "a half century old plurality decision," the State asserts the Eighth Circuit was wrong in Wilkins for concluding that Von Moltke, sets out "clearly established federal law as determined by the Supreme Court of the United States," as required by 28 U.S.C.  2254(d)(1) to grant habeas relief. Two Eighth Circuit cases the State characterizes as similar to the case at bar are Wise, 136 F.3d at 1197, and Hunter v. Bowersox, 172 F.3d 1016 (8th Cir.1999). The State asserts the trial court's holding, that Shafer was competent to waive counsel, was fully supported by an extensive mental health evaluation conducted by Dr. Richard N. Gowdy. Further relying on Dr. Gowdy's opinion, the State contends Shafer's decision to waive counsel was carefully considered and there was no evidence that he suffered from a mental disease or defect which would have precluded him from making the decision knowingly, intelligently and voluntarily. The State contends the trial court's colloquy with Shafer regarding the waiver of counsel was constitutionally adequate. Shafer's distress over jail conditions, the State argues, did not render his *1068 waiver of counsel unconstitutional. The State further contends Shafer did not receive ineffective assistance of counsel rendering his waiver of counsel invalid.
The Court disagrees with the State's argument that Von Moltke, 332 U.S. at 708, 68 S.Ct. 316, is not clearly established Supreme Court precedent. Both the Supreme Court and the Eighth Circuit Court of Appeals have recognized the validity of the decision in Von Moltke. See Penson v. Ohio, 488 U.S. 75, 86-87, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988); Patterson, 487 U.S. at 298, 108 S.Ct. 2389; Wilkins, 145 F.3d at 1013 n. 5 (stating that "[f]ifty years ago, in Von Moltke, 332 U.S. at 724, 68 S.Ct. 316, ... the Supreme Court established the requirement that a judge's inquiry regarding waiver of counsel must be comprehensive and probing."). Even if Von Moltke is not clearly established federal law, other Supreme Court precedent mandates that the trial court ensure a waiver of counsel is knowing, voluntary and intelligent. See Godinez, 509 U.S. at 400, 401 n. 12, 113 S.Ct. 2680; Faretta, 422 U.S. at 819-21, 835-36, 95 S.Ct. 2525; Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).
The issue of Shafer waiving representation by counsel was first addressed by the trial court during a hearing on Shafer's motion to proceed pro se, conducted on July 27, 1992. During this hearing, Shafer explained his rationale for seeking to waive the right to counsel. (PST at 5-17, 44-46). Shafer complained that none of the seven court-appointed attorneys up to that point had done anything to help him with his case. (Id. at 5-7, 46.) After stating that he did not want to cooperate with counsel, Shafer stated "I think that I'm best represented by myself because I know better than anybody what happened and that I've been on the case a lot longer than anybody." (Id. at 6-7.) Responding to the prosecutor's question about why he wanted to plead guilty, Shafer stated "I don't see a trial date forthcoming any time soon and it would save the County and the State a lot of money in the cost of a trial, and if they didn't get a conviction, you know, they would just have to start all over. This way it would be a sure conviction for the State." (Id. at 8.) Although the trial court heard Shafer's brief explanation for seeking to discharge his court-appointed counsel and proceed pro se, the trial court never explained to Shafer during the July 27, 1992 hearing, the dangers of self-representation or inquired whether Shafer understood the potentially serious consequences of waiving his right to counsel.
Shafer's counsel introduced the written report and presented testimony from Dr. Cuneo, a licensed psychologist, at the July 27, 1992 hearing. Dr. Cuneo examined Shafer in May 1992 and diagnosed Shafer as suffering from personality disorder, NOS (not of the specified), which has both borderline and antisocial personality traits. (App. at 2543-48.) He opined that Shafer's personality disorder could be classified as a mental disease. (App. at 2546; PST at 23, 29.) In Dr. Cuneo's opinion, Shafer's personality traits include: a pervasive pattern of instability of self-image, interpersonal relationships and mood; extreme manipulation; self-damaging impulsiveness; inappropriate intense anger and lack of control of anger; low frustration tolerance; recurrent suicide threats when he does not get his way; and a persistent identity disturbance relating to his sexual orientation. (App. at 2545-46; PST at 25-29.) Dr. Cuneo concluded that Shafer was capable of appreciating the wrongfulness of his conduct; was able to conform his conduct to the law; could understand the nature and purpose of the proceedings against him; and could assist in his own defense. (App. at 2547; PST at 29-31.) As to Shafer's ability to proceed pro se, Dr. Cuneo opined that Shafer's personality *1069 characteristics "severely impaired this." (PST at 30.) Further explaining his opinion, Dr. Cuneo testified, "[w]hat happens with Mr. Shafer is he's extremely impulsive. He does not have the knowledge that he thinks that he has and when he gets into this he may change. He's going to vacillate. He's going to bounce from one day to the next and when it's all over, he's going to come back and say, `I want a change,' and he won't have that option then." (PST at 31.)
In cross-examining Dr. Cuneo, the State referenced a written report of Dr. Terrance J. Kukor, a licensed psychologist, dated April 6, 1992, concluding that Shafer was competent to stand trial. (PST at 32.) The pretrial psychiatric examination of Shafer was conducted by Dr. Kukor pursuant to the trial court's order under state law. (App. at 3931.) Dr. Kukor's examination "concern[ed] the defendant's competency to stand trial and criminal responsibility on a charge of Homicide." (App. at 3931.) Shafer informed Dr. Kukor that he had been trying to plead guilty and get the death penalty. Dr. Kukor concluded this "dramatic behavior does not stem from any mental disease or defect, and is thought to be a manipulative gesture, possibly to elicit sympathy." (App. at 3943.) Dr. Kukor diagnosed Shafer with antisocial personality disorder but concluded this disorder did not qualify as a mental disease or defect within the meaning of Missouri law. (App. at 3944.) Although Dr. Kukor did not examine Shafer for the purpose of determining whether Shafer was capable of knowingly, intelligently and voluntarily waiving his right to counsel, his report contains several references to Shafer's relationships with the six attorneys, including Susan McGraugh, who had represented him as of April 1992. (App. at 3945-47.) In general, Shafer felt that all of the attorneys had "screw[ed] up" his case, had not worked too hard on his case and had ulterior motives while representing him. (App. at 3945.) He did not like having a female represent him and did not like McGraugh, in particular, because she was too bossy and tried to control his life and his case. (Id.) He either wanted to be represented by a male attorney or go pro se. (Id.) In the context of determining whether Shafer was competent to stand trial, Dr. Kukor concluded Shafer's oppositional and disdainful attitude with his attorney "is the product of an antisocial personality disorder, and does not stem from any mental disease or defect[,]" and that "although [Shafer] may not be willing to cooperate with his attorney in the preparation of his defense, he has the capacity to do so." (App. at 3945, 3946 (emphasis in original).)
Following the July 27, 1992 hearing on the motion to proceed pro se, the trial court ordered that Shafer undergo a third pretrial mental evaluation. This evaluation was conducted by Dr. Richard N. Gowdy, a certified forensic examiner, in September 1992. Dr. Gowdy evaluated Shafer's "competency to stand trial, his need for inpatient psychiatric treatment while awaiting further proceedings, whether or not he has a mental disease or defect, his responsibility for the alleged criminal actions, and his competency to waive his constitutional right to an attorney and appear pro se and to enter a guilty plea in exchange for the death penalty." (App. at 3954.) After noting Shafer's unwillingness to cooperate with any attorney who encourages him to seek life without parole, Dr. Gowdy concluded "[i]t appears that his decision to proceed pro se and to ask for the death penalty are decisions he has carefully considered to his satisfaction. There is no evidence that he suffers from a mental disease or defect which would preclude him from being able to waive his constitutional right to representation, to appear pro se and to plead guilty in exchange *1070 for the death penalty." (App. at 3959 (emphasis added).)
After receiving Dr. Gowdy's written report, the trial court conducted a second hearing on Shafer's motion to proceed pro se on January 4, 1993. Prior to answering the trial court's questions regarding waiver of counsel, Shafer requested that the court order another evaluation because he alleged the prior evaluations were tainted by his attorneys advising him to provide false information and downplay his competency. (GPT at 7-8.) Denying Shafer's request for a fourth evaluation, the trial court stated that "the Court is not concerned in regard to your competency any longer." (GPT at 8.) The trial court found Shafer was competent to waive his right to counsel. (GPT at 12-13.) Addressing the knowing, intelligent and voluntary issue, the trial court explained:
[I]f you want to discharge counsel, the Court will allow you to do so, but this has to be your decision and you have to be doing this freely and voluntarily and intelligently and without any coercion or any ÔÇö any other reasons, and I must advise you that the Court believes that you would ÔÇö it would be to your advantage to have an attorney, as the Court believes everyone should be represented by counsel to get legal advice, but this is your decision. Can you tell me what you wish to do?
(GPT at 6-7.) Shafer did not answer the trial court's question. (Id. at 7.) Rather, he asked to read a statement relating to his desire to plead guilty. (Id.) Shafer did not want to read the entire statement and asked the trial court to read it. (Id. at 10-11; App. at 2741-45.) After reading Shafer's statement, the trial court observed: "Mr. Shafer, the bottom line of your letter here is again your request to discharge counsel and to enter a plea of guilty today to the two counts of first degree murder. You understand that?" (GPT at 12.) Shafer answered, "Yes." (Id.) Returning to the issue of whether Shafer was knowingly, intelligently and voluntarily waiving his right to counsel, the trial court observed, "based upon its review of you personally and the communications, your intelligence level that the Court has observed of you, your ÔÇö your letters that you have sent to the Court and are part of the court file, all of those have convinced the Court that the Court believes you know what you're doing. Do you feel you know what you're doing?" (Id. at 13.) Shafer answered, "Yes, I do." (Id.) Following this exchange, the trial court granted Shafer's motion to proceed pro se. (Id. at 13.) The prosecutor provided a written waiver of counsel form and Shafer signed it in open court. (Id. at 21-22.) After granting Shafer's motion, the trial court ordered Shafer's counsel to remain in the courtroom in the event Shafer desired to consult with him. (Id. at 13.) The trial court instructed Shafer's counsel that he was not to participate in the proceedings or make any objections on behalf of Shafer. (Id. at 13-14.)
After Shafer was sentenced and his case was on mandatory direct appeal to the Missouri Supreme Court, he filed a motion for post-conviction relief under Missouri law. The state post-conviction court held a three-day hearing on Shafer's motion. During this hearing Dr. Kukor explained that his evaluation of Shafer in March 1992 was not for the purpose of expressing an opinion whether Shafer was able to knowingly, intelligently and voluntarily plead guilty, waive counsel or request the death penalty. (HT at 78-79.) Rather, Dr. Kukor's examination was limited to assessing whether Shafer was competent to stand trial and whether Shafer had a mental disease or defect that would have rendered him unable to know or appreciate the nature, quality or wrongfulness of his actions or to conform his behavior to the law. (Id. at 78, 90-91.)
*1071 Dr. Cuneo testified during the post-conviction evidentiary hearing. Following the imposition of the death penalty, Dr. Cuneo continued his evaluation of Shafer at the request of defense counsel. (HT at 107.) Expanding upon his written report dated June 17, 1992, which was introduced at the July 27, 1992 hearing on Shafer's motion to proceed pro se, Dr. Cuneo opined during the post-conviction hearing that Shafer did not knowingly and voluntarily waive his right to counsel and plead guilty. (Id. at 115-118, 126, 133, 138.)
Dr. Alice Vlietstra, a psychologist specializing in child development, agreed with Dr. Cuneo that Shafer suffered from a borderline personality disorder. (HT at 216-17.) During the post-conviction hearing, she explained that Shafer "was very demanding, he wasn't able to think through consequences, there are a lot of severe mood swings, behavioral regression, and diminished ability to relate appropriately with others." (Id. at 216-17.)
Dr. Eldean Kohrs, a psychologist, first examined Shafer in 1987 and observed that at age 16 Shafer was "extremely incautious and reacts in a manner indicating he did not restrain his impulses or reflect on probable consequences." (App. at 3024; HT at 272.) Pursuant to Shafer's counsel's request, Dr. Kohrs re-evaluated Shafer in 1994 and diagnosed Shafer as suffering from borderline personality disorder. (HT at 279-80.) Shafer has displayed self-defeating behaviors from at least the time he was in the third grade because he would respond to his emotions rather than looking at rational options. (Id. at 282.) In his written report, Dr. Kohrs stated "Robert meets the criteria for competency defined as ability to understand the court process and the charges against him. This does not, however, support pro se. He does not have the ability to proceed in a rational manner, but reacts impulsively on emotional issues without a clear appreciation of the consequences and his own vincibility." (App. at 3030.) Dr. Kohrs opined that Shafer was not able to knowingly, intelligently and voluntarily waive his right to counsel and plead guilty. (HT at 290-91.)
In 1994, Dr. William S. Logan, a psychiatrist, evaluated Shafer at the request of Shafer's counsel. Dr. Logan's primary diagnosis of Shafer was borderline personality disorder. (HT at 375.) According to Dr. Logan, Shafer's borderline personality disorder interfered with his ability to make knowing, intelligent and voluntary decisions and affected his competency at the time of his guilty plea. (Id. at 384-88.) Dr. Logan opined that although Shafer had a factual understanding of the proceedings, it was not a rational understanding. (Id. at 388.) Dr. Logan explained that Shafer "could not knowingly and voluntarily make ÔÇö or intelligently make decisions, because he did not understand the significance of his guilty plea. He had distorted things in his mind to the point that he was not anticipating or correctly evaluating the fact that this guilty plea would not be something that he could simply dismiss in a couple of weeks when he got a different attorney." (Id. at 388.) On the voluntariness issue, Dr. Logan concluded Shafer's mental illness was a continuing force acting upon him and to that extent his decision to plead guilty was coerced. (Id. at 389.)
During the mental health evaluation, Dr. Logan questioned Shafer about a series of letters authored by Shafer prior to his guilty plea. (See App. at 2549-747; HT at 390.) Throughout his testimony, Dr. Logan explained how several letters written by Shafer displayed the characteristics of an impulsive individual with a borderline personality disorder. (HT at 392, 398, 412, 415, 422, 424, 428, 433, 435, 452.) Upon reading and questioning Shafer about *1072 these letters, Dr. Logan formed the opinion that Shafer's need to satisfy his immediate distress or needs interfered or diminished his ability to appreciate the long-term consequences of his decisions. (Id. at 411, 413-14, 425-26, 473, 492.) The first time Shafer suggested in writing to proceed pro se was August 8, 1991, when he was obsessed about having his attorney, Mr. Paul Madison, removed from his case. (HT at 412-13; App. at 2596-97.) Throughout the time Shafer was incarcerated in the St. Charles County Jail, he wrote letters to various individuals and entities, including the trial judge, expressing conflicting thoughts about whether he committed the murders; whether he wanted an attorney or to proceed pro se; suppressing his confessions; having a mental evaluation; and whether to go to trial or plead guilty. (App. at 2593, 2598, 2613-15, 2623, 2625-27, 2644, 2661-69, 2672-74, 2690-92, and 2709-24.) On the same day Shafer pled guilty, he wrote a letter to the trial court complaining that the prosecutor had not complied with his and his attorney's discovery requests and asked that the trial court require the prosecutor to fulfill his obligation to disclose the requested discovery. (App. at 2746.)
During the post-conviction hearing, Dr. Logan testified that Shafer is not competent to stand trial because he cannot "cooperate with an attorney or reach rational decisions in his case about anything." (HT at 472, 476, 452.) In Dr. Logan's opinion, Shafer's distress over the conditions in the St. Charles County Jail adversely impacted his competency to waive counsel and his ability to knowingly and voluntarily plead guilty. (Id. at 453, 423, 427, 430, 432, 442, 450, 489.)
Due to illness, Dr. Patricia Fleming, a clinical psychologist, was unable to testify during the post-conviction hearing on Shafer's motion. Dr. Fleming's deposition was taken shortly after the hearing and the post-conviction court considered her testimony in ruling on Shafer's Rule 24.035 motion. Shafer's counsel at the time, Mr. Jimmerson, retained Dr. Fleming in the fall of 1992 to evaluate Shafer. (App. at 3965-97.) Dr. Fleming met with Shafer for approximately eight-and-one-half hours on December 11 and 12, 1992. (Id. at 3967, 3970.) From her evaluation of Shafer in December 1992, Dr. Fleming concluded Shafer was not competent to proceed pro se and that he was not able to make a knowing, voluntary and intelligent guilty plea. (Id. at 3970.) At the request of Shafer's post-conviction counsel, Dr. Fleming continued her evaluation of Shafer in 1994 and 1995. (Id. at 3970-71.) Based upon her evaluation of Shafer from 1992 to 1995 and her review of voluminous documents, Dr. Fleming concluded Shafer suffers from a bipolar disorder and a borderline personality disorder. (Id. at 3972.) The bipolar disorder diagnosis indicates Shafer experiences both manic and depressive phases. (Id. at 3972-74.) An individual with a borderline personality disorder is "generally very up and down emotionally." (Id. at 3974.) Dr. Fleming explained the similarities between bipolar disorder and borderline personality disorder: "both of them have the emotional highs and lows of a depressive quality and the agitation and the grandiosity of the manic phase. Both of them have that poor judgment, the poor planning, that ÔÇö just inability to foresee consequences of your behavior." (Id. at 3975.)
Although Shafer had a factual understanding of legal proceedings, Dr. Fleming opined that he was unable to have a rational understanding and to make the proper judgment of his information. (Id. at 3978.) Dr. Fleming concluded Shafer was not competent to stand trial and he was unable to knowingly, voluntarily and intelligently waive his right to counsel and plead guilty. (Id. at 3979, 3988.)
*1073 The state post-conviction court concluded that Shafer's decision to waive counsel at the guilty plea stage was not the product of any mental disease and that Shafer understood the charges against him, the range of punishment for those charges and the right to representation at all critical stages of the proceeding. (App. at 3895.) The post-conviction court further concluded that after the notice of aggravating circumstances was filed in July 1992, the record does not disclose that Shafer was advised of the lesser included offenses, punishment for those offenses, possible defenses and the essential mental states for a determination of guilt. (App. at 3895.) Although Shafer was not advised of this information, the post-conviction court concluded it "would very likely have made no difference" because Shafer was intent on pleading guilty. (App. at 3895-96.) On the ultimate issue of whether Shafer intelligently and knowingly waived counsel at the guilty plea proceedings, the post-conviction court ruled that, considering the background, experience and conduct of Shafer, "[t]he shortcomings of the inquiry by the trial court at [the guilty plea] stage of the proceedings were of no significance to a defendant who was clearly and precisely admitting his guilt of the offenses charged. Even if the dangers of proceeding pro se and the advantages of having counsel had been more fully explained, the Movant, who only wanted to plead guilty, would not have changed his desire to waive counsel at the guilty plea." (App. at 3896.) Based upon the above rationale, the post-conviction court denied Shafer's claim that his waiver of counsel at the guilty plea stage was invalid.
The Missouri Supreme Court affirmed the post-conviction court's denial of Shafer's claim that his waiver of counsel at the guilty plea stage was unconstitutional, concluding "Shafer was competent to waive counsel and that he did so knowingly and voluntarily." Shafer, 969 S.W.2d at 731. Shafer contends the Missouri Supreme Court's decision rejecting Shafer's waiver-of-counsel claim was contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court, or, alternatively, that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.
One of the grounds for contending his waiver of counsel is unconstitutional is Shafer's claim that his distress over conditions in the St. Charles County Jail rendered his waiver involuntary. He testified during the hearing on his motion to transfer to a new jail in December 1992 that he felt constantly under verbal, mental, and physical assault in the jail. (JT at 14.) Shafer began complaining of the conditions in the St. Charles County Jail as early as July 1990. (App. at 2555-56.) He wrote several letters to various individuals and organizations complaining about the conditions at the jail. (App. at 2555-56, 2659, 2636, 2666, 2672-74, 2682-84.) Mr. Jimmerson, Shafer's counsel in December 1992, testified during the post-conviction hearing that Shafer's frustrations with the jail increased after his motion for a transfer was denied because he felt he was being kept in an abusive situation. (HT at 643.) Dr. Fleming testified that Shafer was obsessed about the jail conditions and feared he would be sexually abused by guards and inmates. (App. at 3969, 3976.) Dr. Logan testified that Shafer was "quite distressed" about the conditions of his confinement and that his desire to get out of the jail "became an obsession with him." (HT at 483-84, 489.) Ms. Barbara Hoppe, the transfer attorney for the public defender's office, was aware of Shafer's distress over the conditions of his confinement and she was concerned that he would say self-damaging things just to get out of the jail. (HT at 509.)
*1074 During the change of plea hearing, Shafer informed the trial court that he was not pleading guilty just to get out of the St. Charles County Jail. (GPT at.) Dr. Logan opined that Shafer's statements to the trial court actually meant that he did want to plead guilty just to get out of the jail. (HT at 450.) In Dr. Logan's opinion, Shafer was paranoid and fearful of the conditions in the jail and he exhibited "almost frantic efforts ... to try and extricate himself from that situation." (HT at 389.)
The record appears to support Shafer's claim that he was very distressed over the conditions of his confinement in the St. Charles County Jail, even though Shafer may have caused some of his own problems in the jail. It is interesting to note that the denial of Shafer's motion to transfer to a new jail was announced just a few weeks before the final hearing on his motion to proceed pro se. The Court does not find, however, that the record supports Shafer's claim that his distress over the conditions of his confinement, by itself, rendered Shafer's waiver of counsel involuntary under Supreme Court precedent.
Shafer heavily relies on the Eighth Circuit's decision in Wilkins, affirming the district court's grant of a writ of habeas corpus based upon the findings that Wilkins' waiver of his right to counsel, his guilty plea, and his waiver of the right to present mitigating evidence were not made knowingly, intelligently and voluntarily. 145 F.3d at 1016-17. Wilkins waived his right to counsel, pleaded guilty to first-degree murder and was sentenced to death by a Missouri state court. Id. at 1008. Severe physical and emotional abuse were imposed on Wilkins by his mother and other adults from infancy through his teenage years. Id. Wilkins began abusing drugs as a kindergartner and was in and out of mental health facilities after he became a ward of the state at age 10. Id. Mental health professionals diagnosed Wilkins, at the age of 10, with severe depression and homicidal and suicidal tendencies. Id. He was 16 years old when he and his three teenage accomplices committed a murder in the course of a robbery in July 1985. Id. Wilkins confessed to the murder and robbery during police questioning within a few weeks after the crimes were committed. Id. After Wilkins entered a plea of not guilty by reason of mental disease or defect, the court ordered a psychologist, Dr. Steven Mandracchia, to examine Wilkins' mental health. Id. at 1009. Dr. Mandracchia concluded Wilkins was competent to stand trial and was not suffering from a mental disease or defect, as defined by Missouri law, at the time of the offense. Id.
In January 1986, Wilkins informed his court-appointed counsel he wanted to receive the death penalty. Id. A second mental health examination was conducted by a psychiatrist, Dr. William Logan, who believed Wilkins suffered from a mental disease and his mental functioning was "significantly impaired" although Wilkins was not legally insane. Id. Dr. Logan opined that "`emotional issues may prevent him from acting in his own best interests.'" Id. During a competency hearing, Dr. Logan further opined that Wilkins was a "`very impulsive individual who really doesn't think through the consequences of some of his decisions.'" Id.
After finding Wilkins competent to stand trial, Wilkins informed the trial court that he desired to plead guilty to all pending charges. Id. The trial court informed Wilkins several times that he had both a right to counsel and the right to waive counsel. Wilkins v. Bowersox, 933 F.Supp. 1496, 1509 (W.D.Mo.1996) (subsequent history omitted). The trial court postponed Wilkins' request to proceed pro se for one week. Id. During the hearing on Wilkins' request to proceed pro se, the *1075 trial court cautioned Wilkins about the danger of self-representation and "strongly encouraged [him] to accept the services of counsel." Id. at 1510.
Two weeks after granting Wilkins' request to proceed pro se, the trial court accepted Wilkins' uncounselled guilty plea. Id. Seven weeks after accepting the guilty plea, the trial court sentenced Wilkins, age 17, to death by lethal injection. Id. at 1009-10. Wilkins proceeded pro se at the sentencing hearing and the trial court sustained most of Wilkins' objections to the admission of mitigating evidence regarding his mental health. Id.
After Wilkins' death sentence was affirmed by the Missouri Supreme Court on mandatory statutory review, he filed a motion for post-conviction relief pursuant to Missouri Rule of Criminal Procedure 24.035 (1988) seeking to set aside his conviction and sentence. Wilkins, 145 F.3d at 1010. In post-conviction proceedings, several psychiatrists and psychologists testified that Wilkins' guilty plea was not voluntary and intelligent, but rather was the product of an emotionally-charged impulsive decision. Id. Dr. Mandracchia, who earlier opined Wilkins was competent to stand trial, concluded that "Wilkins' waiver of counsel, guilty plea, and waiver of offering mitigating evidence were made knowingly, but these decisions were not made voluntarily or intelligently." Id. The post-conviction court found the expert testimony to be "unpersuasive," and denied relief. Id.
Wilkins filed a petition for writ of habeas corpus pursuant to 28 U.S.C.  2254. Wilkins, 933 F.Supp. at 1501. The federal district court granted Wilkins' petition for a writ of habeas corpus, concluding that although Wilkins was competent, he did not knowingly, intelligently or voluntarily waive his right to counsel, enter his guilty plea, or waive his right to offer mitigating evidence at sentencing. Id. at 1515, 1518-19. In affirming the district court's grant of habeas relief, the Eighth Circuit held that despite the trial court's explanation about the dangers of self-representation and strong encouragement to accept the services of counsel, "the state trial court's inquiry to determine the validity of Wilkins' waiver of his right to counsel was not the kind of `penetrating and comprehensive examination' required to ensure that an accused's waiver of counsel is valid." Wilkins, 145 F.3d at 1012 (quoting Von Moltke, 332 U.S. at 724, 68 S.Ct. 316.)
The Court recognizes that the standard for granting habeas relief under AEDPA are more restrictive than the grounds for granting relief under pre-AEDPA law which was applied in Wilkins. 145 F.3d at 1011; see Williams, 529 U.S. at 412-13, 120 S.Ct. 1495; 28 U.S.C.  2254(d) (1996). Despite this difference, the facts in this case and in Wilkins are closely analogous and the same Supreme Court precedent applies to both cases. As the Eighth Circuit recognized in Wilkins, "[w]hether a defendant validly waived his constitutional right to counsel is not a question of historical fact but a question requiring `application of constitutional principles to the facts as found.'" 145 F.3d at 1011 (quoting Brewer, 430 U.S. at 403, 97 S.Ct. 1232). The Missouri Supreme Court identified the correct legal standard for evaluating the validity of Shafer's waiver of counsel, and, therefore, its decision does not violate the "contrary to" clause in 28 U.S.C.  2254(d)(1). Based upon the discussion in this opinion, however, the Missouri Supreme Court's decision involved an unreasonable application of clearly established Supreme Court precedent to Shafer's waiver of counsel, entitling Shafer to relief pursuant to the "unreasonable application" clause of 28 U.S.C.  2254(d)(1). See Williams, 529 U.S. at 412-13, 120 S.Ct. 1495.
*1076 The Court acknowledges a distinction exists between the present case and Wilkins in that the state's expert witness in Wilkins, "unequivocally stated that Wilkins' waiver of counsel, while done knowingly, was not made intelligently or voluntarily." 145 F.3d at 1014. The Eighth Circuit observed that the state court in Wilkins did not explain why it was unpersuaded by the unanimous expert testimony and held that the record did not support the state court's conclusion that Wilkins knowingly, intelligently and voluntarily waived his right to counsel. Id. In the present case, the State did not conduct an independent mental health evaluation of Shafer, but the trial court appointed two doctors, Drs. Kukor and Gowdy, to evaluate Shafer's competency. Dr. Kukor did not express an opinion regarding Shafer's ability to proceed pro se. (HT at 78-79; App. at 3931-53.) Dr. Gowdy opined that Shafer was competent, i.e. he had the ability, to waive his right to counsel and to plead guilty in exchange for the death penalty, but he did not express an opinion on whether Shafer's waiver of counsel was knowing, intelligent and voluntary. (App. at 3958-59, 3961-62.) Therefore, the record does not contain an expert opinion stating that Shafer knowingly, intelligently and voluntarily waived his right to counsel during the change of plea hearing. The record does, however, contain extensive expert testimony concluding that Shafer's waiver of counsel was not knowing, intelligent and voluntary. (HT at 115-18, 126, 133, 138, 290-91, 384-88; App. at 3979, 3988.) While Shafer's claim that he did not validly waive his right to counsel is not supported by an expert retained by the State or appointed by the court, the experts who did express an opinion on this issue unanimously agreed that Shafer did not knowingly, intelligently and voluntarily waive his right to counsel during the change of plea hearing.
While certain differences exist between the present case and Wilkins, the circumstances surrounding Wilkins' waiver of his right to counsel and guilty plea are strikingly similar to the facts in the case at bar. Shafer's and Wilkins' backgrounds and mental health are similar. Shafer was subjected to severe physical and emotional abuse as a child by his mother and stepfather.[6] Gary Johnson, an adult homosexual male living in Shafer's community, repeatedly sexually abused Shafer for 18 months to two years beginning when Shafer was between 10 and 12 years of age. (App. at 1965-67; 1981-84.) He was addicted to drugs and alcohol at a very young age and was in and out of juvenile correctional facilities and mental health facilities as a teenager. Although Shafer was competent to stand trial, all of the mental health professionals who examined Shafer noted he was an impulsive individual and suffered from a personality disorder. Similar to Wilkins, several of the mental health professionals concluded Shafer did not think through the consequences of his decisions.
The Eighth Circuit concluded in Wilkins that "[g]iven the combination of Wilkins' young age and the record evidence of his severely troubled childhood, the state trial court's colloquy with Wilkins was far from the kind of in-depth inquiry that is necessary to ensure a valid waiver of counsel." Id. at 1013. The district court's opinion in Wilkins explains that although the trial court "strongly encouraged" Wilkins to accept the assistance of counsel, Wilkins did not articulate his rationale for seeking to waive his right to counsel. Wilkins, 933 F.Supp. at 1511 n. 11. Rather, Wilkins merely responded to the trial court's leading *1077 questions with a "yes" or "no" or nod of his head. Id.
The trial court's colloquy with Shafer was even less "in-depth" than the trial court's inquiry in Wilkins. 145 F.3d at 1013. The trial court's discussion with Shafer regarding his decision to waive counsel "consisted predominantly of leading questions that failed to allow [Shafer] to articulate his reasoning process." 145 F.3d at 1012. Although Shafer had written letters to the trial court in support of his motion to proceed pro se, the trial court failed to conduct the type of in-depth inquiry necessary to ensure Shafer's waiver of counsel was knowing, intelligent and voluntary. See id. The trial court accepted Shafer's written communications at face value and did not inquire whether Shafer actually understood all of the relevant considerations in deciding whether to waive his right to counsel. See Godinez, 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (stating that "[t]he purpose of the `knowing and voluntary' inquiry ... is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.").
The trial court's admonitions in Wilkins regarding the dangers of self-representation were much more extensive than those provided to Shafer. During the first hearing on Shafer's motion to proceed pro se, the trial court did not warn Shafer of any dangers or consequences of waiving his right to counsel. The trial court's only statements advising Shafer to accept the services of counsel occurred during the second hearing on Shafer's motion to proceed pro se on January 4, 1993: "I must advise you that the Court believes that you would ÔÇö it would be to your advantage to have an attorney, as the Court believes everyone should be represented by counsel to get legal advice, but this is your decision[,]" and "... you certainly have the right to and I want you to be represented by counsel." (GPT at 7, 9.) These statements barely qualify as warnings, and they certainly did not advise Shafer of any of the specific dangers or disadvantages of waiving his right to counsel or the significance and consequences of that decision.
The Missouri Supreme Court did not find the trial court's shortcomings invalidated Shafer's waiver of counsel. The Missouri Supreme Court recognized that "the decision of an untrained defendant facing the death sentence to proceed without assistance of counsel is nearly beyond comprehension." Shafer, 969 S.W.2d at 728. Despite this recognition of the subtleties and intricacies of trial practice, the Missouri Supreme Court upheld the trial court's acceptance, "at face value," of Shafer's statement that he knew what he was doing. See Wise, 136 F.3d at 1203 (recognizing that a trial court should not merely take the defendant's statement that he is knowingly and intelligently waiving counsel "at face value."). In the same vein, the Missouri Supreme Court stated, "[i]t is not necessary that the defendant be questioned as to all of the things counsel might be able to do to assist the defendant in the legal processes to follow." 969 S.W.2d at 729. While Supreme Court precedent does not require that defendants be questioned about "all of the things" counsel might do for the defendant, federal law clearly establishes that a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.'" Faretta, 422 U.S. at 835, 95 S.Ct. 2525. As explained above, the trial court did not inform Shafer of the dangers and disadvantages of self-representation. The record does not establish that he knew what he was doing as the inquiry was perfunctory. Shafer's decision to waive counsel was not made with "eyes *1078 open." On the same day Shafer plead guilty he was writing the trial court on discovery issues that made no difference because he had entered a guilty plea. (App. at 31.)
The focus of the Missouri Supreme Court's examination of Shafer's age, educational background, and physical and mental health was in determining whether Shafer was competent to waive counsel. Shafer, 969 S.W.2d at 729-30. The Missouri Supreme Court summarized the expert opinions of Drs. Cuneo and Kohrs, as being that "Shafer, while competent to stand trial, was not competent to proceed pro se." Id. at 729. The court then ruled "[a]s a matter of law, the distinction that Drs. Cuneo and Kohrs attempted to draw is meaningless. That is the central teaching of Godinez." Id. This summarization of Drs. Cuneo's and Kohrs' expert opinions completely ignores the doctors' testimony before the post-conviction court where they both explicitly stated that Shafer's decision to waive counsel was not knowing, intelligent and voluntary, which is a distinct opinion from solely concluding Shafer was competent to waive counsel. (See HT at 115-18, 126, 133, 138 (Dr. Cuneo) and 290-91 (Dr. Kohrs)). While the Missouri Supreme Court's factual determination regarding Drs. Cuneo and Kohrs' expert opinions is presumed correct, see 28 U.S.C.  2254(e)(1), clear and convincing evidence exists in the record to rebut this presumption. (HT at 115-18, 126, 133, 138, 290-91.) In addition, the expert opinion of Dr. Fleming on this precise issue was not addressed by the Missouri Supreme Court. (See App. at 3979, 3988.) As explained above, neither Dr. Gowdy nor Dr. Kukor, the court-appointed experts, expressed an opinion on the issue of whether Shafer's waiver of counsel was knowing, intelligent and voluntary. The Missouri Supreme Court's summarization of Drs. Cuneo's and Kohrs' expert testimony amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," 28 U.S.C.  2254(d)(2) and its decision that the doctors' testimony was meaningless was based upon this unreasonable determination of facts.
As in Wilkins, the state courts here "failed to adequately address and consider [Shafer's] background in determining the validity of his waiver of counsel." 145 F.3d at 1012. The trial court did not mention Shafer's upbringing or personality disorders in accepting his waiver of counsel. The Missouri Supreme Court converts Shafer's argument, that his mental condition rendered his waiver of counsel unknowing, unintelligent and involuntary, into a claim that he was not competent to waive counsel. Shafer, 969 S.W.2d at 729. As the Eighth Circuit recognized, however, "the mental health of a defendant is ... a relevant consideration in assessing whether a waiver of counsel was knowing, intelligent, and voluntary." Wilkins, 145 F.3d at 1012. The record does not demonstrate that the trial court or the Missouri Supreme Court took into consideration Shafer's upbringing or personality disorders in evaluating whether his waiver of counsel was knowing, intelligent and voluntary. Shafer, 969 S.W.2d at 729-30. The trial court's and the Missouri Supreme Court's failure to adequately address and consider Shafer's background and mental health in determining the validity of his waiver of counsel amounted to an unreasonable application of the Supreme Court's decision in Edwards, 451 U.S. at 482, 101 S.Ct. 1880 (holding that the validity of a waiver of a constitutional right depends "in each case upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused."). See 28 U.S.C.  2254(d)(1). Moreover, the Missouri Supreme Court's opinion does not "indulge every reasonable presumption against waiver [of the right to counsel]," as directed by the Supreme *1079 Court. Johnson, 304 U.S. at 464, 58 S.Ct. 1019.
Based upon the above discussion and the application of the standard of review under AEDPA, the Missouri Supreme Court's opinion that Shafer's waiver of counsel during his change of plea hearing was a knowing, intelligent and voluntary waiver, is an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. See 28 U.S.C.  2254(d)(1). Shafer is, therefore, entitled to a writ of habeas corpus on this claim. See 28 U.S.C. 2254(a).

C. Guilty Plea
A guilty plea is valid if it represents a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). If a defendant's plea is not "voluntary and knowing, it has been obtained in violation of due process and is therefore void." McCarthy v. United States, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). "Moreover, because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." Id. The prosecution must establish on the record that a guilty plea is constitutionally valid. See Boykin v. Alabama, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). In pleading guilty, a defendant waives the privilege against compulsory self-incrimination, the right to trial by jury and the right to confront one's accusers. See id. at 243, 89 S.Ct. 1709. A valid waiver of these important constitutional rights will not be presumed from a silent record. See id. For many of the same reasons Shafer's waiver of counsel was not valid, the Court concludes Shafer's guilty plea was not valid.
Shafer contends the guilty plea is invalid because the trial court failed to: (1) discuss the meaning of the word "deliberation" in relation to the murder charges; (2) discuss the possibility of lesser included offenses; (3) discuss any possible defenses; (4) discuss any possible punishments other than death or life imprisonment without parole; and (5) inquire whether there were any facts or witnesses that would cast doubt on Shafer's guilt, even after the trial court was made aware that Shafer had no knowledge of the exculpatory ballistics report referenced by the prosecutor during the change of plea hearing. These failures, argues Shafer, demonstrate that the trial court did not conduct a "penetrating and comprehensive examination of all the circumstances under which [the] plea [was] tendered." Von Moltke, 332 U.S. at 724, 68 S.Ct. 316. In addition, Shafer contends his mental disorders precluded him from knowingly and voluntarily pleading guilty. Finally, Shafer argues the trial court erred in accepting his guilty plea without a sufficient factual basis.
The State contends the Missouri Supreme Court reasonably applied the Supreme Court's decision in Godinez, 509 U.S. at 389, 113 S.Ct. 2680, relating to Shafer's guilty plea and its decision should be affirmed under 28 U.S.C.  2254(d). The type of colloquy Shafer claims the trial court should have engaged in with him during the change of plea hearing, the State argues, was rejected by a majority of the Supreme Court in Von Moltke, 332 U.S. at 708, 68 S.Ct. 316. The State maintains that Shafer's confessions admitted at the change of plea hearing form an adequate factual basis for the guilty plea.
The trial court informed Shafer that he had a legal right to remain silent and that by entering a plea of guilty he would be giving up that right to remain silent. (GPT at 17-18, 19-20.) Shafer responded *1080 that he understood his right to remain silent and desired to waive that right. (Id.) The right to trial by jury was explained to Shafer by the trial court and he responded in the affirmative when asked if he understood he would waive a jury trial by pleading guilty. (Id. at 19-20.) The trial court advised Shafer of his right to confront and cross-examine the people that accuse him of the charged crimes. (Id. at 20.) When asked if he understood these rights, Shafer responded "Yes, I do." (Id.) Additional rights were mentioned by the trial court, including the right to subpoena witnesses and present evidence, the right to discovery and the right to be presumed innocent until proven guilty beyond a reasonable doubt. (Id. at 20-21.)
As to the elements of the charged offenses, the trial court simply read the four counts of the indictment and asked Shafer whether he understood what he was charged with in the four separate counts. (GPT at 25-26.) Shafer responded "Yes, I do." (Id.) There was no further explanation of the charges or elements of the offenses by the trial court. The range of punishment for the two murder counts was described as "either life imprisonment without parole or the death penalty by lethal injection." (Id. at 26-27 and 15.) The trial court stated the range of punishment for the two counts charging armed criminal action was a maximum of life imprisonment to a minimum of three-years incarceration without the possibility of parole within that three years. (Id. at 27.) Again, Shafer's responses to the trial court's leading questions whether he understood the range of punishments were, "Yes, I do." (Id.)
Shafer stated that he committed each of the charged crimes. When asked to explain in his own words how he committed the offense of murder in the first degree of Keith Young charged in Count I, Shafer stated "I think that my admission that I did it and my statements should be admitted. I don't ÔÇö I don't feel comfortable with telling the Court in open court." (GPT at 30-31.) The trial court agreed to accept all of Shafer's prior statements in lieu of Shafer's verbal explanation of the offenses in open court. (Id. at 31, 35.) Shafer's July 27, 1992, videotaped confession was admitted into evidence and the trial court viewed the videotape during the hearing. (Id. at 31, 34.) The only other prior statement admitted into evidence was Shafer's 19-page handwritten confession given to Simcox on July 27, 1992, which was referred to in the videotaped confession. (Id. at 35-36.)
After the trial court viewed Shafer's videotaped confession, the prosecutor mentioned that there was "one inconsistency between his statement and the physical evidence." (GPT at 37-38.) The inconsistency is that a ballistics report showed that the bullets in the victims did not match with the gun Shafer claimed he used to commit the charged murders. (Id.) Shafer stated he had not seen the ballistics report, but said "Well, I can only say that I'm sorry that their tests weren't accurate, but I know that was the gun." (Id. at 39.) The prosecutor claimed that the ballistics report had been disclosed to defense counsel. (Id.) Shafer's counsel, however, informed the trial court that he had not received the ballistics report referred to by the prosecutor. (Id.) After complaining that the prosecutor had not given him all the discovery he and his counsel had requested, Shafer stated he still wished to enter a plea of guilty. (Id. at 39-40.) The trial court then found that Shafer's plea of guilty was made freely, voluntarily and intelligently and that he understood the nature of the consequences of the guilty plea. (Id. at 40-41.)
One or two days after the plea and sentencing hearing, Shafer spoke with *1081 Kevin Curran, an assistant public defender, and told him that what had happened was a mistake and he wanted to know what Mr. Curran could do to help him. (HT at 523-24.) In the same month that Shafer's guilty pleas were accepted and the death penalty was imposed, Shafer wrote a letter to the trial court stating that he would "challenge his conviction to the fullest." (App. at 2747.)
The post-conviction court held that the trial court's inquiry prior to the guilty pleas "fell short of perfect but it was legally sufficient." (App. at 3900.) The post-conviction court found that the trial court: (1) failed to explain the word deliberation; (2) failed to inquire whether Shafer was aware of lesser included offenses and the punishment available for them; (3) advised Shafer there were only two potential punishment options ÔÇö the death penalty and life in prison without parole; (4) failed to advise Shafer that a diminished responsibility defense may be presented which could result in a conviction of the lesser included offense of second degree murder ÔÇö a parolable sentence. (App. at 3899-900.) Despite these significant shortcomings, the post-conviction court held that under all the circumstances surrounding the plea of guilty, including Shafer's insistence on receiving the death penalty, the guilty plea was valid. (Id.)
The Missouri Supreme Court held that Shafer's claim that the trial court did not advise him of the intent required for first degree murder is "patently false." Shafer, 969 S.W.2d at 732. Noting that the trial court read the indictment to Shafer, which included the elements of the charged crimes, and that Shafer indicated he heard and understood the trial court, the Missouri Supreme Court stated "[n]either the federal or state constitutions require the trial court to define legal words used in the plea court's questions and statement." Id. The Missouri Supreme Court concluded that Shafer knew the meaning of the word deliberate based upon its review of the record herein. Id. Quoting two passages from Shafer's statements during the change of plea hearing, the Missouri Supreme Court concluded that Shafer was disinterested in any defenses or lesser included offenses to the charged crimes. Id. at 733. Concluding Shafer's guilty plea was entered knowingly and voluntarily, the Missouri Supreme Court denied his claim that the guilty plea was invalid. Id. at 734.
In Wilkins, 145 F.3d at 1015-16, the Eighth Circuit found that Wilkins' guilty plea was not valid for many of the same reasons his waiver of counsel was not valid. The Eighth Circuit noted that "Wilkins conclusory affirmation that he was pleading guilty voluntarily does not establish definitively that his plea was in fact valid." Id. at 1015 (citing Von Moltke, 332 U.S. at 724, 68 S.Ct. 316; Gonzales v. Grammer, 848 F.2d 894, 900 (8th Cir. 1988)). The record in Wilkins failed to show that Wilkins possessed an "understanding of the law in relation to the facts." 145 F.3d at 1015 (quoting McCarthy, 394 U.S. at 466, 89 S.Ct. 1166). The Wilkins' state trial court did not inform Wilkins of possible defenses, possible lesser included offenses or explain the full range of potential punishments for such lesser included offenses. Id. The state's mental health expert testified during the post-conviction proceedings that Wilkins' guilty plea was not intelligent or voluntary. Id.
Again, the present case is strikingly similar to the Wilkins case. As with Shafer's waiver of counsel, the trial court accepted Shafer's statements that he was voluntarily and knowingly pleading guilty "at face value." The trial court did not inform Shafer of any possible defenses such as diminished capacity or discuss the *1082 possibility of being convicted of a lesser included offense which would produce a parolable sentence. The only two possible sentences mentioned by the trial court were the death penalty and life without the possibility of parole. (GPT at 15, 26-27.) The entirety of the trial court's explanation of the elements of the charged crimes consisted of reading the indictment, without any explanation of the term deliberation, an element of first degree murder. See Wilkins, 933 F.Supp. at 1516-17 (explaining the mental elements for first degree murder and second degree murder under Missouri law). When the prosecutor mentioned there was "one inconsistency" between Shafer's statement and the physical evidence, Shafer's response did not show that he appreciated the magnitude of this "inconsistency." (GPT at 37-40.) The trial court again accepted at face value Shafer's statement that he wanted to plead guilty despite the prosecutor's revelation. (GPT at 40-41.) As explained in detail above, the record in this case demonstrates that Shafer's mental impairments and upbringing interfered with his ability to make decisions and consider the long-term consequences of those decisions. The experts who expressed an opinion on the issue of whether Shafer's guilty plea was made knowingly, intelligently and voluntarily ÔÇö as opposed to expressing an opinion about Shafer's competency to plead guilty ÔÇö opined that Shafer's guilty plea was not knowing, intelligent and voluntary. (HT at 115-18, 126, 133, 138, 290-91, 384-88; App. at 3979, 3988.) The two experts appointed by the trial court to evaluate Shafer's mental health, Drs. Kukor and Gowdy, did not express opinions on the issue of whether Shafer's guilty plea was made knowingly, intelligently and voluntarily. (HT at 78-79; App. at 3931-53 (Dr. Kukor); App. at 3958-59, 3961-62 (Dr. Gowdy).) The record in this case, in light of the leading questions and omissions on the part of the trial court and the other evidence explained in this opinion, does not demonstrate that Shafer understood the law in relation to the facts, McCarthy, 394 U.S. at 466, 89 S.Ct. 1166, and the "alternative courses of action" available to him. Alford, 400 U.S. at 31, 91 S.Ct. 160; see Boykin, 395 U.S. at 242, 89 S.Ct. 1709 (stating that the prosecution must establish on the record that a guilty plea is constitutionally valid). Shafer's guilty plea was not made knowingly, intelligently and voluntarily and it is, therefore, invalid. See Alford, 400 U.S. at 31, 91 S.Ct. 160; Godinez, 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (explaining that "[t]he purpose of the `knowing and voluntary' inquiry ... is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced."). The Missouri Supreme Court's decision involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court. See 28 U.S.C.  2254(d)(1). Thus, Shafer is entitled to a writ of habeas corpus on his claim that his guilty plea is unconstitutional. See 28 U.S.C.  2254(a).
Although Shafer's guilty plea is invalid, his claim that the guilty plea lacked a factual basis is not a valid ground for relief. If the guilty plea had been made knowingly, intelligently and voluntarily, Shafer's plea would have been supported by a sufficient factual basis. The written and videotaped confessions admitted during the change of plea hearing provided a sufficient factual basis for the guilty plea.

D. Waiver of Counsel for the Sentencing Phase and Waiver of Mitigation
The trial court engaged in a brief colloquy with Shafer regarding his waiver of counsel for the sentencing phase:
THE COURT: As I indicated earlier to you, you're entitled to again be represented *1083 by counsel and a right to have a jury determine this sentence that should be imposed against you, do you understand that?
THE DEFENDANT: Yes.
THE COURT: And is it your desire to continue to waive counsel as well as a right to waive a jury trial?
THE DEFENDANT: Yes.
THE COURT: And have you been forced, coerced, threatened or abused in any way to get you to make those waivers?
THE DEFENDANT: No, I haven't.
THE COURT: Do you believe that you're doing that freely and voluntarily on your part?
THE DEFENDANT: Yes, I do.
THE COURT: And it's not because someone else has told you to?
THE DEFENDANT: No.
THE COURT: And who made the final decision to do that?
THE DEFENDANT: I did.
(GPT at 41-42.)
Waiver of the right to counsel must be made knowingly, intelligently and voluntarily. Faretta, 422 U.S. at 819-21, 835-36, 95 S.Ct. 2525. Although Shafer need not have possessed the skill and experience of a lawyer to choose self-representation during the sentencing phase, he should have been "made aware of the dangers and disadvantages of self-representation, so that the record [would] establish that `he [knew] what he [was] doing and his choice [was] made with eyes open.'" Id. at 835, 95 S.Ct. 2525 (quoting Adams, 317 U.S. at 279, 63 S.Ct. 236.)
The trial court's inquiry regarding Shafer's waiver of counsel for the sentencing phase was even more cursory than the inquiry regarding waiving counsel during the change of plea phase. (GPT at 42-51.) The trial court took Shafer's statements that he was knowingly and voluntarily waiving his right to counsel for the sentencing phase "at face value." See Wise, 136 F.3d at 1203 (trial court should not merely take defendant's statement that he is knowingly and voluntarily waiving counsel "at face value"). The dangers and disadvantages of self-representation during the sentencing phase were never explained to Shafer by the trial court. (GPT at 42-51.) The trial court did not explain what types of evidence constitute mitigation evidence or the significance and consequences of failing to present such evidence. (See GPT at 42-43.) Counsel's ability to present mitigation evidence was never explained to Shafer. (See GPT at 42-43.)
In addition to the above cursory examination regarding waiver of counsel, the trial court misled Shafer regarding the necessity of proceeding with sentencing on January 4, 1993. Immediately after accepting his guilty plea to all four charges, the trial court said, "At this time, it's necessary to proceed to sentencing. Do you understand that?" (GPT at 41.) Shafer responded "Yes." (Id.) After Shafer waived his right to counsel, waived his right to present mitigating evidence and the State introduced evidence of aggravating circumstances, the following exchange occurred:
THE COURT: .... Having found that [aggravating circumstances exist in this case], the Court is prepared to proceed with sentencing today. Do you wish the Court to proceed with sentencing today?
THE DEFENDANT: Well, do I have an option?
THE COURT: Well, I've received your plea of guilty and I've concluded now the first and second stages for your plea and sentencing, I just have not pronounced a sentence on you. You understand it's up to the Court to determine what sentence should be *1084 imposed against you. The only options that the Court has is life imprisonment without parole or the death sentence. You have requested the death sentence. The State, I understand by the aggravating circumstances, has requested the death sentence. I'm prepared to proceed today if you wish to proceed.
THE DEFENDANT: I'll proceed.
(GPT at 47.) Despite all of the evidence in the record regarding Shafer's background, mental health and tendency to act impulsively, the trial court continued with the sentencing of Shafer in the absence of counsel and without offering to postpone the sentencing hearing to a later date. Although a presentence investigation report is not constitutionally required, the trial court did not offer that option to Shafer at the time Shafer inquired whether he had any options other than proceeding with sentencing on January 4, 1993.
The Missouri Supreme Court concluded Shafer was competent to waive counsel at the sentencing phase based upon the finding that Shafer was competent to stand trial. Shafer 969 S.W.2d at 737. This conclusion does not address the issue of whether Shafer's waiver of counsel during the sentencing phase was knowing, intelligent and voluntary as required by clearly established Supreme Court precedent. See Godinez, 509 U.S. at 400, 113 S.Ct. 2680. The Supreme Court clearly held that "[a] finding that a defendant is competent to stand trial ... is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." Id.
The Court's discussion above in connection with Shafer's waiver of counsel during the change of plea hearing is equally applicable to Shafer's waiver of counsel for the sentencing phase of the state court proceedings and is expressly relied upon in finding that Shafer's waiver of counsel during the sentencing phase is invalid. Even if the Court had determined that Shafer's waiver of counsel for the change of plea hearing was valid, however, the discussion above regarding the sentencing phase demonstrates that Shafer's waiver of counsel for the sentencing phase was invalid. The record does not demonstrate that Shafer actually understood "the significance and consequences" of his decision to waive counsel during the sentencing phase. See Godinez, 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (stating that "[t]he purpose of the `knowing and voluntary' inquiry ... is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced."). The Missouri Supreme Court's decision that Shafer's waiver of counsel during the sentencing phase was valid resulted from an unreasonable application of Federal law as determined by the Supreme Court. See 28 U.S.C.  2254(d)(1). Therefore, Shafer is entitled to habeas relief on his claim that his waiver of counsel during the sentencing phase of the state trial court proceedings was invalid. See 28 U.S.C.  2254(a).
On the issue of mitigation, the post-conviction court found that the trial court failed to "adequately inform [Shafer] of his options at the sentencing stage," including his right to present mitigation evidence and his right under state law to a presentence investigation report, rendering his waiver of the presentation of mitigating evidence not voluntary, knowing and intelligent. (App. at 3905.) Reviewing for plain error, the Missouri Supreme Court denied Shafer's claim regarding waiver of mitigation evidence. Shafer, 969 S.W.2d at 736. Noting that the sentencing court *1085 had no obligation to consider mitigating evidence not presented, the Missouri Supreme Court concluded "Shafer's decision not to present additional evidence in mitigation can be attributed to strategy." Id. The court stated that "[f]rom the time he turned himself in, Shafer employed a strategy to assure he would receive the death penalty." Id. As explained below, the record in this case establishes by clear and convincing evidence that this finding of fact by the Missouri Supreme Court is patently incorrect. See 28 U.S.C.  2254(e)(1) (stating that a "determination of a factual issue made by a State court shall be presumed to be correct" and that presumption can be rebutted only by "clear and convincing evidence.").
During the hearing on Shafer's post-conviction motion, Mr. Jeffrey Rosanswank, the supervisor of Shafer's first court-appointed attorney, Mr. Paul Madison, testified that Shafer was not seeking to plead guilty or receive the death penalty during Mr. Madison's representation of him. (HT at 62.) Madison was the first attorney appointed to represent Shafer and he was removed from Shafer's case in the fall of 1991. (HT at 57, 64.) Shafer constantly wrote and telephoned Rosanswank complaining of Madison's inept representation. (HT at 47, 54, 63.) The primary complaints Shafer made about Madison were that he was not communicating with Shafer about the case, would not return his phone calls or respond to his letters, and that Madison felt Shafer was guilty and did not want to hear what Shafer had to say about the case. (HT at 55-56.) Madison informed Rosanswank that he believed Shafer was guilty and was lying and that "whatever Robert got was what Robert deserved." (HT at 58-59, 61.) While Shafer was represented by Madison, there was a pattern of failure to have quality and a good number of contacts between Madison and his clients and failure to communicate properly the status of the cases. (HT at 45, 50.) The complaints against Madison were so numerous and serious that in July 1992, Madison was given the option of being terminated or resigning from the public defender's system. (HT at 53-54.) Madison resigned. (Id.)
At the same time Shafer was complaining to Rosanswank about Madison's inept representation, Shafer wrote several letters seeking assistance to remove Madison from his case. The letters were to other individuals in the public defender's system, Congressmen, the American Civil Liberties Union, and the Attorney General of Missouri. (App. at 2567-68, 2598-604.) In December 1990, Shafer discussed the possibility of a plea agreement. (App. 2575.) In April and July 1991, Shafer wrote the trial court requesting that Madison be removed from the case and asked that a new attorney be appointed to represent him. (App. at 2590-91, 2594.) Shafer also wrote a letter in April 1991 to Barbara Hoppe, the transfer attorney for the public defender's office, requesting a new attorney and stating that he told Madison he wanted to look into a plea bargain. (App. at 2592-93.)
The first suggestion that Shafer may waive his right to counsel came in August 1991 immediately after the trial court denied his request to have Madison removed from his case. (App. at 2596-97.) Shafer was obviously frustrated with Madison and believed Madison was rendering ineffective assistance of counsel. (Id.) Shafer did not mention pleading guilty or seeking the death penalty, rather he stated, "I just want to make sure that I'm being represented by someone that is effective to me, and I don't believe that Mr. Madison is." (Id.) In September 1991, Shafer again wrote the trial court requesting that Madison be removed or he would proceed pro se. (App. 2505-06.) Shafer did not mention *1086 that he wanted to plead guilty or receive the death penalty as of September 1991, nearly 17 months after he was first arrested. (App. 2606.) Rather, Shafer stated "[m]y case may be getting set for trial soon and I would like to either be represented by an adequate attorney, or be representing myself. Mr. Madison is not competently representing me." (App. 2606.)
The first suggestion that Shafer would plead guilty to the death penalty was written in a letter to the public defender's office in February 1992. (App. at 2631-33.) Within a few weeks of suggesting he would plead guilty, Shafer wrote his newly assigned public defender, Susan McGraugh, stating "I'm not going to let anyone ruin my chances at freedom." (App. at 2635.) Shafer was again dissatisfied with his court-appointed counsel. (App. at 2634-36.) Two weeks later, in March 1992, Shafer wrote identical letters to the prosecutor and the trial court stating he would plead guilty to the death penalty. (App. at 2637-40.) Then in July 1992, Shafer informed his attorney, Susan McGraugh, that he would plead guilty to either the death penalty or life without parole. (App. at 2659.)
The above discussion as well as the remainder of Shafer's letters in the record (App. at 2549-747), demonstrate, by clear and convincing evidence, that the Missouri Supreme Court's finding of fact as to Shafer's strategy is incorrect. See 28 U.S.C.  2254(e)(1); Shafer, 969 S.W.2d at 736. It was only after nearly 22 months of being frustrated with his court-appointed attorneys and being confined in the St. Charles County Jail that Shafer first suggested he would plead guilty to the death penalty. (App. at 2631-33.) The Missouri Supreme Court's ultimate holding on this issue was that "Shafer voluntarily and knowingly waived his opportunity to present mitigating evidence at sentencing." Shafer, 969 S.W.2d at 736.
The entirety of the trial court's explanation and colloquy with Shafer regarding the issue of mitigation evidence was as follows:
THE COURT: At this stage of the proceedings, Mr. Shafer, you have an opportunity to offer any evidence or statement in mitigation, which means on why the Court should sympathize with you and why the Court should give you the lesser of the two sentences, meaning give you life instead of the death sentence, you understand that?
THE DEFENDANT: Yes, I understand that.
THE COURT: And, then, the State has the right to make a statement ÔÇö or offer evidence, excuse me, of aggravating circumstances, if they so desire, and I'll have to hear from them as to what they want to do, do you understand?
THE DEFENDANT: Yes.
THE COURT: All right. Do you wish to offer any statement or evidence in mitigation?
THE DEFENDANT: No, I don't.
THE COURT: Do you wish to make any statement at all to the Court in regard to what sentence the Court should impose against you?
THE DEFENDANT: Well, I'd like to go back to the letter that I gave the Court, the first letter, and all of the letters that I have sent to the court and take that into consideration when I ask for the death penalty.
THE COURT: And by this, do you understand that you're requesting the Court to impose the death penalty against you?
THE DEFENDANT: Yes, I do.

*1087 THE COURT: And that's what you're requesting?
THE DEFENDANT: Yes, I am.
THE COURT: All right.
(GPT at 42-44.) As evidenced by the above excerpt from the sentencing hearing, the trial court never explained to Shafer what types of evidence constituted mitigation evidence. The record does not demonstrate that Shafer actually knew how the presentation of mitigation evidence could affect the trial court's decision. See Godinez, 509 U.S. at 401 n. 12, 113 S.Ct. 2680. The discussions above regarding Shafer's background and mental health are equally relevant to the determination of whether Shafer's waiver of the right to present mitigating evidence was knowing, intelligent and voluntary.
Based upon the above discussion, the Court concludes the Missouri Supreme Court's decision that Shafer knowingly, intelligently and voluntarily waived his right to present mitigation evidence involved an unreasonable application of Supreme Court precedent and Shafer is entitled to habeas relief on this claim.[7]See 28 U.S.C.  2254(a), (d)(1).

E. Ineffective Assistance of Counsel
Shafer contends he received ineffective assistance from each of the seven attorneys who represented him, rendering his waiver of counsel, guilty plea, and waiver of the right to present mitigating evidence not knowing, intelligent and voluntary. Counsel was ineffective, Shafer argues, because they: failed to investigate his innocence and his defenses; failed to properly object to admission of the report of Dr. Kukor at the July 1992 hearing; failed to move to suppress the allegedly unconstitutionally obtained July 1992 confessions; failed to communicate with him; had conflicts of interest; failed to seek a favorable plea bargain; and failed to renew his motion to transfer to a new jail.
The State asserts that Shafer's reasons for seeking to plead guilty, as stated to the trial court, are inconsistent with his claim that he would have proceeded to trial if one or more of his attorneys had more vigorously investigated the case in preparation for trial. See Shafer, 969 S.W.2d at 732-33 (noting that Shafer indicated he wished to plead guilty because of his conscience, concern for the victims' families, and the desire "to get it over with" rather than go through lengthy appeals). The Missouri Supreme Court did not address Shafer's claim of ineffective assistance of counsel.
The Supreme Court set forth a two-part test for evaluating ineffective assistance of counsel claims:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to *1088 deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To satisfy the first prong, the petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness." Id. at 687, 104 S.Ct. 2052. To satisfy the second prong, petitioner must demonstrate "a reasonable probability that, but for counsel's error," the result would have been different. Id. at 694, 104 S.Ct. 2052. In the context of a guilty plea, the second prong is satisfied only if the defendant shows that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 58-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (footnote omitted). Judicial scrutiny of counsel's performance is highly deferential; thus there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
If he had received effective assistance of counsel, Shafer claims he would not have pleaded guilty and would have insisted on going to trial, or, at the very least, he would not have pleaded guilty to the death penalty. The record supports Shafer's claim that the attorneys appointed prior to the appointment of Susan McGraugh in January 1992 failed to investigate his case. McGraugh testified during the post-conviction hearing that when she began representing Shafer in January 1992, "[t]here was no investigation in the file, there was hardly any correspondence in the file. There were police reports in the file, but they weren't even in chronological or numerical order. There was no investigation in the file, there were no depositions, there was ÔÇö it was a very bare file." (HT at 528-29.) McGraugh further testified that she "would have expected to see more progress on [Shafer's] case" by the time she began representing him in January 1992. (HT at 531.) The only witness McGraugh interviewed on Shafer's behalf was his sister. (HT at 550.) Jimmerson, Shafer's last court-appointed attorney prior to entry of his guilty plea, testified at the post-conviction hearing that "little work had been done" in Shafer's case by the five or six attorneys who represented Shafer before Jimmerson was appointed. (HT at 652.)
The Court concludes that although the record supports Shafer's claim that Madison, the first attorney appointed to represent Shafer, rendered deficient performance by failing to communicate with Shafer, and by failing to investigate or perform any substantial work on Shafer's case for nearly 17 months, the record does not show that absent Madison's errors, Shafer would have insisted on going to trial. Even after Madison was removed from the case, Shafer spoke with McGraugh about the possibility of negotiating a plea agreement with the State for a term of imprisonment of between 10 and 20 years. (HT at 550.) While the record shows that Shafer was extremely frustrated by the lack of progress on his case, the record does not show that Shafer would have insisted on going to trial absent Madison's deficient performance. See Hill, 474 U.S. at 58-59, 106 S.Ct. 366.
McGraugh conducted very little investigation in Shafer's case during the approximately seven months that she represented Shafer. (HT at 528-29, 550.) Even if McGraugh's performance was deficient for her failure to investigate, however, the record does not establish that Shafer would have insisted on going to trial absent that deficient performance. See Hill, 474 U.S. at 58-59, 106 S.Ct. 366.
When Jimmerson took over Shafer's case in October 1992, he began communicating *1089 with Shafer on an almost daily basis. (HT at 640.) Shafer spent much of his time with Jimmerson complaining about the conditions of confinement at the St. Charles County Jail rather than discussing the facts of his case, which hindered Jimmerson's preparation of Shafer's defense. (HT at 640-41, 643, 647.) Jimmerson felt he was doing everything a competent attorney would do while representing Shafer and that he was "doing a good job." (HT at 652.) It appears that Jimmerson did investigate Shafer's possible defenses and was in the process of preparing Shafer's case for trial when Shafer suddenly entered a guilty plea to the death penalty. (HT at 652, 661.) Given the short period of time Jimmerson represented Shafer and the collateral issues Shafer insisted Jimmerson address, the record does not support a claim that Jimmerson rendered ineffective assistance of counsel by failing to investigate Shafer's innocence and defenses.
Shafer cannot establish that failure to file a motion to suppress his confessions constituted ineffective assistance of counsel. As explained above, Shafer's Sixth Amendment right to counsel was not violated and the confessions are constitutionally valid. Failure to file a suppression motion, therefore, did not prejudice Shafer.
Failure to object to the admission of Dr. Kukor's report during the July 27, 1992, hearing did not result in prejudice to Shafer. McGraugh testified she erred by neglecting to object to the report. (HT at 557.) However, the record does not support Shafer's claim that he would have insisted on going to trial if Dr. Kukor's report had been excluded at the competency hearing on July 27, 1992.
Failure to seek a favorable plea bargain is one of Shafer's allegations against Madison and McGraugh. Even if Shafer can establish that this failure constituted deficient performance, he cannot satisfy the second prong of the Strickland test because this claim cannot be grounds for an ineffective-assistance-of-counsel claim where the petitioner pled guilty. As explained above, to satisfy the second prong, Shafer must show that he "would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 58-59, 106 S.Ct. 366.
Shafer alleges that two attorneys, Mr. Kerr and Mr. Hartig, had conflicts of interest because of their relationships with Steinmeyer's attorney. The record shows that once the conflicts of interest were discovered, Kerr and Hartig withdrew as Shafer's attorney. There is no evidence in the record to support a claim that Kerr or Hartig revealed any information to Steinmeyer's attorney which was prejudicial to Shafer. Moreover, Shafer cannot demonstrate a reasonable probability that, but for these conflicts of interest, he would have insisted on going to trial rather than pleading guilty. See id.
Jimmerson filed a motion to transfer Shafer to a new jail which was denied by the state court in December 1992. (JT at 197-202.) Shafer alleges Jimmerson's failure to renew this motion constituted ineffective assistance of counsel. The Court concluded above that although the conditions of Shafer's confinement were very distressing to him, those conditions did not render Shafer's waiver of counsel involuntary. Shafer does not allege that the conditions of his confinement worsened after the motion to transfer was denied such that a renewal of the motion to transfer would have been granted by the state court. The record does not establish that failure to renew the motion to transfer constituted deficient performance by Jimmerson.
In conclusion, while Shafer was extremely frustrated with his attorneys for failing *1090 to communicate with him and investigate his case, and it may have had some affect on his decision to waive his right to counsel and plead guilty, the record does not show that he would have insisted on going to trial absent any alleged deficient performance by his attorneys. See Hill, 474 U.S. at 58-59, 106 S.Ct. 366. Therefore, Shafer is not entitled to federal habeas relief for ineffective assistance of counsel.

F. Competency Hearing
Before Shafer waived his right to counsel during the January 4, 1993 hearing, Shafer requested that the trial court order an additional mental health evaluation to determine whether he was competent. In this argument, Shafer appears to confuse the issue of his competence to waive his right to counsel and plead guilty and the issue of whether a waiver of counsel and plea of guilty is knowing, intelligent and voluntary. As explained above, the majority of the mental health experts who evaluated Shafer opined that he was competent to stand trial. This is the same level of competence required to have the ability to waive counsel and plead guilty. See Godinez, 509 U.S. at 399-400, 113 S.Ct. 2680. The Supreme Court explained, "[t]he focus of a competency inquiry is the defendant's mental capacity; the question is whether he had the ability to understand the proceedings." Godinez, 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (emphasis in original). In light of the evidence in the record, including some of Shafer's own experts' opinions, that Shafer had the ability to waive counsel and plead guilty, the Missouri Supreme Court's rejection of Shafer's claim that the trial court should have ordered an additional mental health evaluation to determine whether he was competent, did not involve an unreasonable application of clearly established Supreme Court precedent. See 28 U.S.C.  2254(d)(1).

G. Proportionality
Shafer claims that his death sentence is disproportionate to the twelve-and-one-half-year sentence his co-defendant, Steinmeyer, received for the murders of Parker and Young. The State counters that Shafer, rather than Steinmeyer, shot both Parker and Young and he was, therefore, more culpable than Steinmeyer. In any event, the State argues, the Missouri Supreme Court correctly held that the proper proportionality analysis is whether the punishment Shafer received was disproportionate to his crime, not whether Steinmeyer received a lesser punishment.
The Missouri Supreme Court conducted the review of Shafer's death sentence required by Section 565.035 of the Missouri Revised Statutes (1994), concluding the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; the evidence supports the judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032; and, was not excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence and the defendant. Shafer, 969 S.W.2d at 741-42.
Given that Shafer's July 24, 1992 confessions are constitutionally valid, the Court does not find that the Missouri Supreme Court's decision was contrary to or involved an unreasonable application of clearly established Supreme Court precedent or that it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. See 28 U.S.C.  2254(d); Pulley v. Harris, 465 U.S. 37, 50-51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (the Eighth Amendment does not require proportionality review in death penalty cases); Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S.Ct. *1091 2227, 65 L.Ed.2d 175 (1980) (a state may create a liberty interest protected by the Due Process Clause of the Fourteenth Amendment if it provides a criminal defendant with a "substantial and legitimate expectation" of certain procedural protections); Honda Motor Co. v. Oberg, 512 U.S. 415, 434, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) (the Due Process Clause is intended to protect individuals from arbitrary deprivations of liberty or property).

H. Failure to Consider Mitigating Circumstances
Shafer argues that the trial court failed to consider mitigating circumstances before imposing the death sentence, rendering his sentence unconstitutional. The State counters that review by this Court is barred because the Missouri Supreme Court conducted a plain error review, or, alternatively, that an exceptionally deferential review standard applies. Under this deferential review, the State asserts that Shafer's claim "clearly fails."
The Missouri Supreme Court reviewed this claim for plain error because Shafer failed to object at the sentencing hearing to the trial court's failure to consider mitigating circumstances. Presuming that the trial court followed the state law requiring consideration of mitigating circumstances, the Missouri Supreme Court concluded the trial court had a great deal of mitigating evidence before it and was aware of the role of such evidence in reaching a sentencing decision. Shafer, 969 S.W.2d at 734-36. In the Missouri Supreme Court's opinion, the trial court's statement that it had considered all the evidence before it in arriving at a sentencing decision met the requirements of section 565.032, Missouri Revised Statutes (1994), and the trial court "had no obligation to consider mitigating evidence that was not presented." Id. at 736.
The Court will conduct its review of this claim under the standards provided in the AEDPA, 28 U.S.C.  2254(d). See Basile v. Bowersox, 125 F.Supp.2d 930, 939-40 (E.D.Mo.1999) (concluding that even if the state court reviews a state prisoner's claim for plain error, a federal habeas court should apply the AEDPA standard of review set forth in 28 U.S.C.  2254(d)(1)). The Supreme Court held that "a determination of what the trial judge found is an issue of historical fact. It depends on an examination of the transcript of the trial and sentencing hearing, and the sentencing order. This is not a legal issue." Parker v. Dugger, 498 U.S. 308, 320, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). Therefore, whether the trial court failed to consider mitigating circumstances in this case is a factual issue subject to review under 28 U.S.C.  2254(e)(1).
It is undisputed that Shafer did not present any mitigating circumstances during the sentencing hearing. The Court concluded above that Shafer's waiver of the right to present mitigating evidence was not made knowingly, intelligently and voluntarily. The trial court did not mention any mitigating circumstances in imposing the death sentence. Immediately before announcing the death sentence, the trial court mentioned that it had considered Shafer's letters to the trial court ÔÇö requesting that he be given the death penalty ÔÇö and the State's evidence of aggravating circumstances, but no mention was made of any of the mitigating circumstances in the record. Moreover, the trial judge's report prepared by the trial court two days after the sentencing hearing did not state that any mitigating circumstances were indicated by the evidence. (App. at 3430.)
The Supreme Court held that:
[W]e conclude that the Eighth and Fourteenth Amendments require that *1092 the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death..... Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases..... The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.
Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (footnotes and citations omitted).
Considering the unconstitutionality of Shafer's waiver of the right to present mitigating circumstances, the transcript of the sentencing hearing and the trial judge's report (App. at 3427-35), Shafer has rebutted, by clear and convincing evidence, the presumption of correctness applied to the Missouri Supreme Court's opinion holding that the trial court did not unlawfully fail to consider mitigating circumstances. See 28 U.S.C.  2254(e)(1). Shafer is entitled to habeas relief based on the Missouri Supreme Court's unreasonable determination of the facts relating to the trial court's consideration of mitigating circumstances in light of the evidence presented in the state court proceedings. See 28 U.S.C.  2254(d)(2). Moreover, the Missouri Supreme Court's decision holding that Shafer's death sentence is constitutionally valid, involved an unreasonable application of clearly established Supreme Court precedent requiring a sentencing court to make an individualized decision in capital cases. See 28 U.S.C.  2254(d)(1); Lockett, 438 U.S. at 604-05, 98 S.Ct. 2954; Woodson v. North Carolina, 428 U.S. 280, 304-05, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality) (holding that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment, ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").

I. Aggravating Circumstances
Shafer asserts that all five of the aggravating circumstances found by the trial court were invalid. The primary argument advanced by Shafer on this claim is that because his confessions were unconstitutionally obtained, the confessions cannot support the finding of aggravating circumstances. The State's response to this claim is that Shafer's July 24, 1992 confessions clearly support the finding of several aggravating circumstances found by the trial court and that those confessions are constitutionally valid. Relying primarily on Shafer's July 24, 1992 confessions, the Missouri Supreme Court held that the evidence before the trial court clearly supported a finding of four aggravating circumstances found by the trial court. Shafer, 969 S.W.2d at 739.
Missouri is a "non-weighing" state, and, therefore, if the sentencing court finds at least one valid aggravating circumstance, the death penalty may be imposed even if other aggravating circumstances found by the sentencing court are held to be invalid. See Sloan v. Delo, 54 F.3d 1371, 1385-86 (8th Cir.1995), cert. denied, 516 U.S. 1056, 116 S.Ct. 728, 133 L.Ed.2d 679 (1996); Ramsey v. Bowersox, 149 F.3d 749, 754-55 (8th Cir.1998), cert. denied, 525 U.S. 1166, 119 S.Ct. 1083, 143 L.Ed.2d 85 (1999). Shafer's challenge to the validity of his July 24, 1992 confessions was rejected above. The confessions support *1093 the Missouri Supreme Court's findings regarding aggravating circumstances. Shafer, 969 S.W.2d at 739-40; Mo.Rev. Stat.  565.032.2 (1994). The Missouri Supreme Court's decision regarding aggravating circumstances is neither contrary to nor does it involve an unreasonable application of clearly established federal law, and it is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C.  2254(d)(1), (2).

J. Trial Court's Ex parte Communications With Prosecutor
Shafer asserts the trial court denied him a fair trial by engaging in ex parte communications with the prosecutor prior to the hearing on January 4, 1993. Shafer claims that before the January 4, 1993 hearing, Judge Dalton informed the prosecutor, in defense counsel's absence, that he was going to allow Shafer to plead guilty and sentence him to death. The State contends this claim is procedurally barred.
The prosecutor testified at the post-conviction hearing that Judge Dalton called him prior to the hearing on January 4, 1993. The prosecutor could not recall "about when" the telephone conversation took place. The judge told the prosecutor that Shafer "wished to plead guilty and was asking for death." (HT at 751.) Jimmerson, Shafer's counsel at the time, was not included in this telephone conversation between Judge Dalton and the prosecutor. (HT at 753.) Judge Dalton informed the prosecutor during this conversation that "he was going to do it." (HT at 751.) The prosecutor testified that he thought that Judge Dalton meant that he was "going to proceed with the plea." (HT at 751.) From this conversation, the prosecutor was left with the impression that Judge Dalton was going to accept Shafer's guilty plea. (HT at 752-53.) The prosecutor was never asked the follow-up question of whether he thought the judge was also indicating that he was also going to give Shafer the death penalty when the judge said "he was going to do it." Judge Dalton's statement to the prosecutor could be so interpreted, even under the dampening influence of the prosecutor testifying concerning this ex parte communication.
The Missouri Supreme Court held that this claim was procedurally waived because Shafer failed to state this claim in his post-conviction motion under Rule 24.035. Shafer, 969 S.W.2d at 740. Shafer contends this issue could not have been raised in the post-conviction motion because the evidence of the ex parte communication "came out" at the hearing on the post-conviction motion. He further asserts this claim was properly raised in his direct appeal.
Missouri law provides that a defendant may appeal a guilty plea, but that the issues on such an appeal are limited to subject matter jurisdiction and sufficiency of the criminal charge. See State v. Carrillo, 935 S.W.2d 328, 329 (Mo.Ct.App. 1996); State v. Sparks, 916 S.W.2d 234, 236 (Mo.Ct.App.1995); State v. Strebel, 674 S.W.2d 688, 689 (Mo.Ct.App.1984). Rule 24.035 of the Missouri Rules of Criminal Procedure provides the exclusive procedure by which a person convicted of a felony on a plea of guilty may challenge his conviction on the grounds that the conviction or sentence violates the constitution of the United States or the state laws or constitution. Failure to include a claim that may be pursued under Rule 24.035 results in waiver of that claim. See Rule 24.035; State v. Kreutzer, 928 S.W.2d 854, 878 (Mo.1996), cert. denied 519 U.S. 1083, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997) (failure to raise a claim in a Rule 29.15 motion results in waiver of that claim).
The Supreme Court held that "States have substantial discretion to develop and implement programs to aid prisoners *1094 seeking to secure post-conviction review." Pennsylvania v. Finley, 481 U.S. 551, 559, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). Shafer has not demonstrated that the Missouri Supreme Court's decision rejecting Shafer's ex parte communications claim was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C.  2254(d)(1), (2). Therefore, although the ex parte communications between the trial court and the prosecutor indicate at the least that the trial court decided to accept Shafer's guilty plea at some unspecified time prior to the change of plea hearing, Shafer is not entitled to habeas relief on this ground. See id. Whether the trial judge was also indicating that he would impose the death penalty is unclear in the record, so Shafer is not entitled to habeas relief on that ground. There was another ex parte communication before the July 27, 1992 hearing to determine whether Shafer could proceed pro se. In that conversation, the prosecutor asked the judge if the judge wanted the prosecutor to subpoena the state psychologist for the hearing. The judge responded that he did not see a need for it without specifically instructing the prosecutor. (HT at 752.) While neither of these ex parte communications and their contents are condoned, they do not provide, in and of themselves, a separate basis for habeas relief. These ex parte communications, their timing and their contents do diminish the confidence in these proceedings.

III. Conclusion
The Court rejects Shafer's claim that his July 24, 1992 confessions violate his Sixth Amendment right to counsel. The Court further rejects Shafer's claims that he received ineffective assistance of counsel; his death sentence is disproportionate; the aggravating circumstances found by the trial court were invalid; and he was denied a fair trial due to ex parte communications between the trial court and the prosecutor. For the reasons stated above, however, the Court will conditionally grant the petition for writ of habeas corpus on Shafer's claims that his waiver of his right to counsel for the guilty plea and sentencing phases of the state proceedings, his guilty plea, and his waiver of the right to present mitigating evidence were not made knowingly, intelligently, and voluntarily and on Shafer's claim that the trial court failed to consider mitigating circumstances in sentencing him to the death penalty. This conditional writ shall become unconditional and permanent unless the State of Missouri permits Shafer to withdraw his plea of guilty and commences proceedings to afford petitioner a trial within sixty days of the date of this Order. Accordingly,
IT IS ORDERED:
1. That petitioner, Robert Shafer's, Petition For Writ of Habeas Corpus Pursuant to 28 U.S.C.  2254, is conditionally granted on petitioner's claims that: (a) his waiver of his right to counsel for the guilty plea phase of the state proceedings was not made knowingly, intelligently, and voluntarily; (b) his waiver of his right to counsel for the sentencing phase of the state proceedings was not made knowingly, intelligently, and voluntarily; (c) his guilty plea was not made knowingly, intelligently, and voluntarily; (d) his waiver of the right to present mitigating evidence was not made knowingly, intelligently, and voluntarily; and (e) the trial court failed to consider mitigating circumstances in sentencing him to the death penalty. The Petition is denied in all other respects.

*1095 2. That this conditional writ shall become unconditional and permanent unless the State of Missouri permits petitioner Robert Shafer to withdraw his plea of guilty and commences proceedings to afford petitioner Robert Shafer a trial within sixty days of the date of this Order.
NOTES
[1] The Honorable David A. Dalton, Missouri Circuit Court.
[2] For ease of reference in this opinion, the transcripts in the record will be referred to as follows: Shafer's Appendix (App. at ___.); hearing on Shafer's motion to proceed pro se on July 27, 1992 (PST at ____.); hearing on motion to transfer to different jail on December 9 and 12, 1992 (JT at ___.); second hearing on motion to proceed pro se, guilty plea and sentencing on January 4, 1993 (GPT at ___.); and hearing on Shafer's post-conviction motion on July 8-10, 1996 (HT at ___.).
[3] Co-defendant Steinmeyer's version of the crimes differs from Shafer's version regarding the motive for the crimes, but Steinmeyer testified during his change of plea hearing that Shafer shot both Young and Parker and Steinmeyer did not shoot either of the victims. (App. at 2146-50.) Steinmeyer testified that a fight erupted between him and Parker because Parker made a homosexual advance toward him. (App. at 2146-47.)
[4] The Honorable Lucy D. Rauch, Missouri Circuit Court.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] The severe abuse suffered by Shafer is explained in detail in several depositions of Shafer's friends and family members, including Shafer's mother. (App. at 1852-2053.)
[7] The Missouri courts may need to examine what, if any, affect the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) has on Missouri's law permitting the sentencing court, rather than a jury, to determine whether aggravating circumstances exist in a capital case. See Hoffman v. Arave, 236 F.3d 523, 542-43 (9th Cir.2001) (recognizing that, in light of Apprendi, some doubt may exist as to the validity of the Supreme Court's decision in Walton v. Arizona, 497 U.S. 639, 647-48, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) that an aggravating circumstance in a capital case may constitutionally be determined by a judge rather than a jury); Scott v. Baldwin, 225 F.3d 1020, 1023 (9th Cir.2000) (finding a defendant must exhaust an Apprendi claim in state court before pursuing it in a  2254 petition).